## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| **DAVID BEATY and** | ) |
| **DB SPORTS, LLC,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )　　　　**Case No. 2:19-CV-02137** |
| | ) |
| **KANSAS ATHLETICS, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

### MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Defendant Kansas Athletics, Inc., ("Kansas Athletics") submits the following

memorandum in support of its motion to dismiss for lack of jurisdiction pursuant to Fed.

R. Civ. P. 12(b)(1) and for failure to state a claim upon which relief can be granted

pursuant to Fed. R. Civ. P. 12(b)(6).

## I.    INTRODUCTION

A necessary foundation for any lawsuit is jurisdiction, ensuring that the court

where the action was filed has authority to hear and resolve the claims between the

parties. This foundation is missing here. The facts show that Plaintiffs were Kansas

citizens at the time they filed this lawsuit in federal court, which prevents the court from

exercising jurisdiction based on the diversity of citizenship of the parties. Further, Kansas

Athletics is an arm of the State, as a controlled affiliated corporation of the University of

Kansas. This fact destroys the diversity jurisdiction claimed by Plaintiffs, and also gives

Kansas Athletics immunity from suit in federal court under the Eleventh Amendment.

Plaintiffs could have filed suit in state court, but they chose a court without jurisdiction to hear and resolve the dispute. For these reasons, the court must dismiss the Complaint.

To the extent this court finds that it has jurisdiction to hear and resolve this dispute, Plaintiffs' claim under the Kansas Wage Payment Act must be dismissed for failure to state a claim upon which relief can be granted. The contracts at issue do not provide for wages after Beaty's termination. The parties disagree whether payment is currently owed to Beaty or DB Sports. Kansas Athletics denies that it currently owes any amount to Plaintiffs. Any payments contemplated under the contracts are on hold due to an ongoing, unresolved investigation that will determine whether Beaty committed acts by which he would forfeit the payment of liquidated damages.

However, at this stage of the litigation, the court can only consider the facts alleged in the Complaint, including the written instruments attached as exhibits. The contracts attached to the Complaint clearly show that any payments to be made after termination are in the form of liquidated damages, not wages. Further, the payments contemplated to be made to DB Sports are certainly not wages. Therefore, Plaintiffs' claim under the Kansas Wage Payment Act must be dismissed.

## II.    NATURE OF THE CASE

Plaintiffs David Beaty and DB Sports, LLC, ("DB Sports") bring this action for their claims based in state law – breach of contract and violation of the Kansas Wage Payment Act. The case asserts no federal question. Plaintiffs filed this action in federal court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs claim that Kansas Athletics has breached contracts with David Beaty and DB Sports by not

making certain payments after Beaty was terminated as the Head Football Coach for the

University of Kansas. Beaty further claims that the failure to make payments to him was

a violation of the Kansas Wage Payment Act, K.S.A. §§ 44-313 through 44-327.

## III.    QUESTIONS PRESENTED

**A.    This court lacks subject matter jurisdiction over plaintiffs' claims.**

    **1.    Plaintiffs are Kansas citizens suing a Kansas corporation, and therefore, there is no basis for diversity jurisdiction.**

    **2.    Kansas Athletics, Inc., is an arm of the State, is not a citizen for diversity jurisdiction purposes, and is entitled to immunity from suit in federal court under the Eleventh Amendment.**

**B.    Plaintiffs' claim under the Kansas Wage Payment Act fails to state a claim upon which relief can be granted.**

## IV.    STANDARD OF REVIEW FOR MOTION TO DISMISS

A motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter

jurisdiction can take two forms, each with a different standard of review. *Holt v. United*

*States*, 46 F.3d 1000, 1002 (10th Cir. 1995). First, the review of a *facial* attack on the

complaint requires the district court to accept the allegations in the complaint as true.

*Ibid.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990)).

But the review of a *factual* attack on claimed subject matter jurisdiction allows a party to

go beyond the allegations of the complaint and challenge those facts alleged in support of

jurisdiction. *Id.* at 1003. In reviewing a factual attack on subject matter jurisdiction, a

district court does not presume the truthfulness of the factual allegations in the complaint.

*Ibid.* Instead, the court has wide discretion to consider affidavits, other documents, and a

limited evidentiary hearing to resolve disputed jurisdictional facts. *Ibid.* (citing *Wheeler*

*v. Hurdman*, 825 F.2d 257, 259 n. 5 (10th Cir.), *cert. denied*, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987)). However, the references to evidence outside the pleadings do not convert the motion to a Rule 56 motion. *Ibid*.

As the parties seeking to invoke federal jurisdiction, Plaintiffs bear the burden of proving that jurisdiction is proper. *Jones v. United States*, 305 F.Supp.2d 1200, 1207 (D. Kan. 2004) (citing *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974)). Because federal courts are courts of limited jurisdiction, the presumption is against federal jurisdiction. *Id.* A federal court lacking subject matter jurisdiction "must dismiss the case at any stage of the proceeding in which it becomes apparent that such jurisdiction is absent." *Id.*

In reviewing a complaint upon a motion to dismiss pursuant to Fed R. Civ. P 12(b)(6), a court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Anderson v. Bristol, Inc.*, 847 F.Supp.2d 1128, 1132 (S.D. Iowa 2012) (citing Fed. R. Civ. P. 8(a)(2)). A viable complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570)). "The plausibility standard requires a plaintiff to show at the pleading stage that

success on the merits is more than a 'sheer possibility.' It is not, however, a 'probability requirement.'" *Iqbal*, 129 S. Ct. at 1949.

## V.   STATEMENT OF THE FACTS

### A. Plaintiffs' Citizenship

1.   Plaintiff David Beaty purports to be a citizen of the State of Texas (Doc. 1, p. 1).

2.   Plaintiff DB Sports, LLC, a Kansas limited liability company, states that its sole member is a citizen of the State of Texas (Doc. 1, ¶ 2).

3.   The Petition was filed March 12, 2019. (Doc. 1).

4.   At 10:12 pm on March 12, 2019, DB Sports, LLC, filed its Annual Statement with the Kansas Secretary of State. (Ex. A ¶ 2; Ex. B). In the Annual Statement, DB Sports identified its sole member as Beaty, with an address of 109 Fall Ridge, Lawrence, KS 66045. (Ex. B). DB Sports also identified its official mailing address as: "David Beaty, 109 Fall Ridge Ln, Lawrence KS 66049." (Ex. B). Beaty signed the Annual Report on March 12, 2019. (Ex. B).

5.   Since January 29, 2016, and through at least May 8, 2019, Beaty and his wife Raynee Beaty owned real estate in Douglas County, Kansas:

> Lot 2, in a Replat of Lots 8, 9, 10, & 11, Block One Fall
> Creek Farms, 10th Plat, a subdivision in the City of Lawrence,
> Douglas County, Kansas.

(Ex. A ¶ 3; Ex. C). This property is commonly known as 109 Fall Ridge Lane. (Ex. A ¶ 3).

6.   From March 11, 2016 to May 16, 2019, Beaty's address on file with Kansas Athletics for payroll purposes has been 109 Fall Ridge Lane, Lawrence, Kansas. (Ex. F ¶¶ 2-5; Ex. G; Ex. H).

7.   Through at least May 8, 2019, Beaty and his wife owned watercraft registered at 109 Fall Ridge Lane, Lawrence, Kansas. (Ex. A ¶ 4; Ex. D).

8.   From October 20, 2008, through at least May 7, 2019, Beaty was registered to vote in Douglas County, Kansas. (Ex. A ¶ 5; Ex. E). During that time, Beaty has voted twice, in the November 2008 General Election and in the November 2016 General Election. (Ex. E). Beaty's most recent address for voting purposes was at 927 Drum Dr., Lawrence, Kansas. (Ex. E).

**B.  Kansas Athletics, Inc.**

9.   Kansas Athletics, Inc., was originally incorporated under the name "The University of Kansas Physical Education Corporation" by Charter filed with the Kansas Secretary of State on July 16, 1925. The name was later changed to The University of Kansas Athletic Corporation. On August 18, 2005, the name was changed to Kansas Athletics, Incorporated. (Ex. I ¶ 2).

10. Kansas Athletics, Inc., is a not for profit corporation whose purposes are:

- to develop intercollegiate athletic teams composed of students at the University of Kansas and to schedule and manage intercollegiate athletic contests, all in harmony with and subject to the general educational policies of the University of Kansas, and the Constitution of the National Collegiate Athletic Association;
- to collect and own the receipts from such contests and such other moneys and goods as may be given or granted to the Corporation;
- to expend and disburse such receipts, gifts, and grants in the interests of the intercollegiate athletic program at the University of Kansas;

- to borrow money for the aforesaid purposes;
- to own and lease, either or both, such real and personal property, either or both, as is necessary, proper, or advisable for the aforesaid purposes; and
- in general, to do any and all things incidental to or necessary, proper, or advisable for the carrying out of its purposes aforesaid.

(Ex. J, Article Third).

11. Kansas Athletics does not have the authority to issue capital stock. (Ex. J, Article Fourth).

12. The business of Kansas Athletics is managed and its affairs conducted by a Board of Directors with seven specified members : 1) the Chancellor of the University of Kansas; 2) the University of Kansas Director of Intercollegiate Athletics; 3) the University of Kansas Chief Financial Officer and Vice Provost of Finance; 4) the University of Kansas Faculty Athletics Representative to the Big 12 Conference (or its successor) appointed by the Chancellor; 5) a Senior University Administrator (the Provost or designee) University of Kansas, Lawrence campus; 6) the Vice Provost for Student Affairs, University of Kansas, Lawrence campus; and 7) the President of the Student Body of the University of Kansas, Lawrence campus. (Ex. I ¶ 5; Ex. L).

13. The current seven members of the Board of Directors of Kansas Athletics, Inc. are: 1) Doug Girod, Chancellor of the University of Kansas; 2) Jeff Long, University of Kansas Director of Intercollegiate Athletics; 3) Diane Goddard, University of Kansas Chief Financial Officer and Vice Provost for Finance; 4) Susan Stagg-Williams, University of Kansas Faculty Athletics Representative to the Big 12 Conference and Professor in the School of Engineering for Chemical & Petroleum Engineering; 5) Carl Lejuez, University of Kansas Interim Provost and Executive Vice Chancellor; 6)

Tammara Durham, Vice Provost for Student Affairs, University of Kansas, Lawrence campus; and 7) Tiara Floyd, President of the Student Body of the University of Kansas, Lawrence campus. (Ex. I ¶ 6).

14. The Student Body President is elected annually by the students of the University. The other members of the Board of Directors are employees of the University. (Ex. I ¶ 7).

15. The Chancellor has ultimate responsibility and final authority for the conduct and administration of all aspects of the athletics program. (Ex. J, Article Fifth).

16. The Chancellor may cause Kansas Athletics to proceed as he or she determines to be in the best interest of the athletics program and the University, notwithstanding decisions made by the Board of Directors. (Ex. J, Article Fifth).

17. The Bylaws of Kansas Athletics specify that the Board acts as a policy-making body, determines the method of conducting the business of Kansas Athletics, and makes recommendations to the Chancellor regarding its annual budget. (Ex. K, Art. I, Sec. 2).

18. The Board of Directors recommends the annual budget for Kansas Athletics, Inc. The final approval of the annual budget rests with the Chancellor. (Ex. I ¶ 8).

19. The University and Kansas Athletics, Inc. (formerly known as The University of Kansas Athletic Corporation) entered an operating agreement effective December 1, 1988 ("Operating Agreement"). (Ex. I ¶ 9; Ex. M).

20. The Operating Agreement provides that Kansas Athletics will operate the intercollegiate athletic program as a division of the University. (Ex. M, § 1).

21. Kansas Athletics is subject at all times to applicable University regulations and administrative policies unless the Chancellor has approved a variation. (Ex. M, § 1).

22. The University has granted that all of the gate receipts for intercollegiate athletic events, all donations to Kansas Athletics, all student activity fees allocated to Kansas Athletics, and all other income of Kansas Athletics will be the property of Kansas Athletics to defray the cost of operating, improving and maintaining the intercollegiate athletic program of the University and to defray the cost of operating, and of constructing, improving and maintaining facilities for the intercollegiate athletic program. (Ex. M, § 5).

23. Kansas Athletics is entitled to the use and control of Memorial Stadium, Allen Field House, Allen Filed House Annex, Parrott Athletic Center, Shaffer-Holland Strength Center, the baseball field, the tennis courts at Allen Field House, the intercollegiate athletic practice areas, and Anschutz Sports Pavilion. (Ex. I ¶ 13; Ex. N, First Amendment § 1, amending § 2 of the Operating Agreement). The University has agreed to make other University facilities available to Kansas Athletics as may reasonably be necessary for the operation of the intercollegiate athletic program (Ex. I ¶ 13; Ex. N, First Amendment § 3, amending § 4 of the Operating Agreement).

24. Kansas Athletics operates the University's trademark licensing program. (Ex. I ¶¶ 12, 14; Ex. P, Third Amendment § 1).

25. Kansas Athletics also has the right to enter agreements for apparel and media rights for the benefit of the University's intercollegiate athletics program. Kansas Athletics has the exclusive right to sell concessions at intercollegiate athletic events held on the Lawrence campus. Unless otherwise agreed, the revenue from these activities is the property of Kansas Athletics to defray the cost of operating, improving, and

maintaining the University's intercollegiate athletics program. (Ex. I ¶ 15; Ex. P, Third Amendment § 2).

26. With prior approval of the Chancellor, Kansas Athletics may borrow money for the construction or improvement of facilities or for the purchase of equipment or for operational expenses. (Ex. M, § 6).

27. Kansas Athletics, Inc., is a controlled affiliated corporation under the policies promulgated by the Kansas Board of Regents. (Ex. I ¶ 20).

28. "Affiliated corporations are incorporated entities, whether controlled or non-controlled by the university, that are funded solely or primarily by monies other than state funds and the purpose of which is to enhance or support the mission and activities of a state university." (Ex. I ¶ 21; Ex. R, Chapter II, Section D.8.a, p. 70).

29. Affiliated corporations include, but are not limited to, alumni associations, incorporated student unions, endowment associations or foundations, and athletic corporations. (Ex. I ¶ 21; Ex. R, Chapter II, Section D.8.a, p. 70).

30. Controlled affiliated corporations must meet one of two criteria:

> (1)     A majority of a quorum of the board of directors, or other committee charged with making decisions on behalf of the corporation, are university personnel or appointed by the state university chief executive officer, or
>
> (2)     The corporation is otherwise controlled by the university or the university chief executive officer, as determined by the following considerations.
>
> > (a) Does the university chief executive officer appoint voting members to the corporation's organizational committee (i.e. executive committee, finance committee, audit committee, etc.)?

(b) Does the university chief executive officer designate, appoint or hire the corporation's executive director/chief executive officer?

(c) To what extent does the university chief executive officer have control over the management of the corporation's day to day operations as well as control of its major decision making processes?

(d) To what extent are public funds used to fulfill the corporation's responsibilities and mission?

(Ex. I ¶ 21; Ex. R, Chapter II, Section D.8.b., p. 70).

31. Under the Operating Agreement, the books and records of Kansas Athletics are public records that will be annually audited by an independent certified public accountant. (Ex. M, § 5).

32. The audit report is furnished to the Board of Regents and filed with the state agency in charge of post auditing state expenditures. (Ex. M, § 5).

33. The financial records of Kansas Athletics, Inc., are public records, subject to independent audit. The Independent Auditor's Report and Consolidated Financial Statements of Kansas Athletics, Incorporated and Subsidiary for Fiscal Year 2018 ("2018 Audit Report") was prepared by BKD, LLP. (Ex. I ¶¶ 17-18; Ex. Q).

34. The 2018 Audit Report shows that for Fiscal Year 2018, Kansas Athletics received direct institutional support in the amount of $1,502,799; NCAA and conference distributions totaled $32,695,636; Contributions and grants totaled $27,549,851; Ticket sales and handling fees totaled $20,581,056; and Sponsorship and royalties totaled $16,513,684. (Ex. I ¶ 19; Ex. Q, p. 6).

35. The Total Operating Revenues for FY2018 was $104,411,118. (Ex. I ¶ 20; Ex. Q, p. 6).

### C.  Contracts at Issue

### 2014 Beaty Contract

36. Beaty and Kansas Athletics entered an Employment Agreement effective December 8, 2014 ("2014 Beaty Contract"), which Plaintiffs attached to the Petition. (Doc. 1-1).

37. The 2014 Beaty Contract states that Kansas Athletics "operates the intercollegiate athletics programs of the University of Kansas (KU), subject to the direction and control of the Chancellor of the University of Kansas." (Doc. 1-1, First WHEREAS).

38. The term of the 2014 Beaty Contract was 5 years, from December 8, 2014 through December 31, 2019. (Doc. 1-1, § 2).

39. The 2014 Beaty Contract was signed by Beaty; Beaty's Agent; and Kansas Athletics by the Director of Athletics. (Doc. 1-1, pp. 16-17).

40. The agreement was approved by the Chancellor of the University and the General Counsel for the University. (Doc. 1-1, p. 17).

41. The agreement provided Beaty an annual salary of $225,000. (Doc. 1-1, § 4).

42. The agreement also provided payment of $575,00 per year as income for professional services, initially paid directly to Beaty, but paid to DB Sports ("Contractor") after March 3, 2015. (Doc. 1-1, § 7.A).

43. The agreement stated that in the event Beaty's employment was terminated without cause pursuant to Section 12 of the agreement, Contractor would be entitled to

payment under Section 7 for 24 months or up to December 31, 2019 (whichever occurs first). (Doc. 1-1, § 7.D).

44. The payments under Section 12 of the agreement "shall be considered as liquidated damages with no other sums or damages of any kind whatsoever paid by Athletics to Contractor." (Doc. 1-1, § 7.D).

45. In the event Beaty's employment was terminated pursuant to Sections 13 or 15, Contractor would be entitled to payment under Section 7 up to the date of termination only. (Doc. 1-1, § 7.E).

46. The agreement was not binding until it was signed by the Director of Athletics and approved by the Chancellor of the University and the Compensation Committee of the Board of Directors of Kansas Athletics. (Doc. 1-1, § 24).

**2016 Beaty Amendment**

47. Beaty and Kansas Athletics entered a First Amendment to the Employment Agreement, which became effective December 1, 2016 ("2016 Beaty Amendment"). (Doc. 1-2).

48. The 2016 Beaty Amendment reiterated that Kansas Athletics "operates the intercollegiate athletics programs of the University of Kansas (KU), subject to the direction and control of the Chancellor of the University of Kansas." (Doc. 1-2, First WHEREAS).

49. The 2016 Beaty Amendment was signed by Beaty and Kansas Athletics by the Director of Athletics. (Doc. 1-2, p. 4).

50. The agreement was approved by Beaty's Agent; the Chancellor of the University; and the General Counsel for the University. (Doc. 1-2, pp. 4-5).

51. The 2016 Beaty Amendment extended the term of the 2014 Beaty Contract two years, to end December 31, 2021. (Doc. 1-2, § 1).

52. Beaty's annual salary remained at $225,000. (Doc. 1-2, § 2).

53. The payment to DB Sports for professional services increased to $1,375,000 through 2017, and then would increase $100,000 each year thereafter. (Doc. 1-2, § 4).

54. The amendment revised Section 7.D of the 2014 Beaty Contract:

> In the event [Beaty's] employment is terminated without cause pursuant to Section 12 of this Agreement, Contractor shall be entitled to a payment under this Section 7 in the total amount of $2,580,000.00 payable in six equal installments commencing on the last day of the month immediately following the month in which the termination date occurs and continuing on the last day of each succeeding month thereafter; the payments under this Section 7 and under Section 12 shall be considered as Liquidated Damages with no other sums or damages of any kind whatsoever paid by Athletics to Contractor.

(Doc. 1-2, § 4).

55. Section 12 was similarly amended in the event of termination without cause:

> A. Athletics shall have the right to terminate this Agreement without cause at any time upon written notice to Head Coach. In the event Athletics terminates this Agreement without cause, Athletics, in addition to all amounts due and owing under this Agreement up to the date of termination, shall be liable to Head Coach for a Liquidated Damages total payment of $420,000.00 payable in six equal installments; other than payment under Section 7 and payments under this Section 12, no other sums or damages of any kind whatsoever shall be paid by Athletics to [Beaty].

B. The Liquidated Damages above shall be paid to [Beaty] in six equal monthly installments commencing on the last day of the month immediately following the month in which the termination date occurs and continuing on the last day of each succeeding month thereafter.

C. The parties agree that such Liquidated Damages are in lieu of all other compensation and benefits owed to [Beaty], including annual and sick leave, otherwise owed to [Beaty] under any and all other provisions of this Agreement; and further constitute reasonable compensation for losses that [Beaty] will incur and are not a penalty.

(Doc. 1-2, § 5).

56. The Amendment also provided that if Beaty terminated the Agreement he would be responsible to pay Liquidated Damages to Kansas Athletics. (Doc. 1-2, § 6).

**2015 DB Sports Contract**

57. DB Sports LLC and Kansas Athletics entered a Professional Services Agreement effective March 3, 2015 ("2015 DB Sports Contract"). (Doc. 1-3).

58. The term of the 2015 DB Sports Contract was from March 3, 2015, to December 31, 2019. (Doc. 1-3, § 2).

59. The 2015 DB Sports Contract was signed by DB Sports LLC through Beaty and the Agent for DB Sports; and Kansas Athletics by the Director of Athletics. (Doc. 1-3, p. 5).

60. The agreement was approved by the Chancellor of the University and the General Counsel for the University. (Doc. 1-3, p. 6).

61. The 2015 DB Sports Contract provided payment of $575,00 per year as income for professional services paid to DB Sports ("Contractor"). (Doc. 1-3, § 3).

62. The agreement stated that in the event Beaty's employment was terminated without cause pursuant to Section 12 of the 2014 Beaty Contract, Contractor would be entitled to payment, as liquidated damages, for 24 months or the remaining term of the 2014 Beaty Contract, whichever is less. (Doc. 1-3, § 2.D).

63. The liquidated damages "are in lieu of all other claims or damages under this contract and further constitute reasonable compensation for losses and are not a penalty and shall be apportioned, as feasible, on a monthly basis." (Doc. 1-3, § 2.D).

64. In the event Beaty's employment was terminated pursuant to Sections 13 or 15, Contractor would be entitled to payment under Section 7 up to the date of termination only. (Doc. 1-3, §§ 2.C & 2.E).

65. DB Sports is an independent contractor and is not an agent of Kansas Athletics or the University. (Doc. 1-3, § 8).

66. All persons performing services for DB Sports in connection with the agreement are employees, agents or subcontractors of DB Sports. (Doc. 1-3, §8).

**2016 DB Sports Amendment**

67. DB Sports LLC and Kansas Athletics entered a First Amendment to the Professional Services Agreement, which became effective December 1, 2016 ("2016 DB Sports Amendment"). (Doc. 1-4).

68. The term of the 2016 DB Sports Amendment was from December 1, 2016, to December 31, 2021. (Doc. 1-4, § 1).

69. The 2015 DB Sports Contract was signed by DB Sports LLC through Beaty; and Kansas Athletics by the Director of Athletics. (Doc. 1-4, p. 2).

70. The amendment was approved by the Agent for DB Sports, the Chancellor of the University, and the General Counsel for the University. (Doc. 1-4, p. 2-3).

71. The payment to DB Sports for professional services increased to $1,375,000 through 2017, and then would increase $100,000 each year thereafter. (Doc. 1-4, § 2).

72. The 2016 DB Sports Amendment revised Section 2.D regarding the payment of liquidated damages upon termination for cause.

> In the event [Beaty's] employment is terminated by Athletics, other than for cause as defined in his Employment Agreement, Contractor shall be paid all amounts which have accrued under this Professional Services Agreement as of the termination date and, as provided in [Beaty's] Employment Agreement, [Beaty] shall be entitled to a payment in the amount of $2,580,000 payable in six equal installments commencing on the last day of the month immediately following the month in which the termination date occurs and continuing on the last day of each succeeding month thereafter. The payments under this section shall be considered as Liquidated Damages; and other than the Liquidated Damages provided in Section 12 of the Employment Agreement, no other sums or damages of any kind whatsoever shall [be] paid by Athletics to Contractor or [Beaty].

(Doc. 1-4, § 1).

73. Plaintiffs state that Kansas Athletics terminated Beaty effective November 24, 2018. (Doc. 1, ¶ 49).

74. Plaintiffs state that at the time of the termination, the termination was not for cause and that Kansas Athletics agreed to pay liquidated damages payments consistent with Section 12 of the amended Employment Agreement and Section 7(D) of the amended Professional Services Agreement. (Doc. 1, ¶ 49).

75. Plaintiffs state that on December 14, 2018, Kansas Athletics notified Beaty of an investigation of potential NCAA rules violations, and that payments would be withheld until it could evaluate the results of the investigation and determine whether Beaty's termination would be classified as with or without cause. (Doc. 1, ¶¶ 55-56).

76. Plaintiffs state that Kansas Athletics has a contractual obligation to pay Beaty $3,000,000. (Doc. 1, ¶ 12.).

77. Plaintiffs state that as of the date of the Complaint, Kansas Athletics has not paid all wages due to Beaty. (Doc. 1, ¶ 79).

## VI.    ARGUMENT AND AUTHORITIES

### A. This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims.

#### 1.  Plaintiffs are Kansas citizens, so there is no diversity jurisdiction.

"When jurisdiction is premised on diversity of citizenship under 28 U.S.C. § 1332(a), as is the case here, each plaintiff must be diverse from each defendant to have what is known as complete diversity. " *Ravenswood Inv. Co., L.P. v. Avalon Corr. Servs.*, 651 F.3d 1219, 1223 (10th Cir. 2011) (quoting *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 829 & n. 1, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989)).

A limited liability company, as an unincorporated association, takes the citizenship of all its members. S*iloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1234 (10th Cir. 2015). DB Sports LLC states in the Petition that it has only one member. DB Sports LLC, in a filing with the Kansas Secretary of State on March 12, 2019, listed Beaty as its only member.  Therefore, the status of Beaty's citizenship controls the citizenship of DB Sports, LLC.

The jurisdiction of the court is analyzed based on "the state of things at the time of the action brought." *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570, 124 S. Ct. 1920, 1924, 158 L. Ed. 2d 866 (2004). The citizenship of Plaintiffs is therefore based on the circumstances on March 12, 2019, the date the Complaint was filed.

For purposes of diversity jurisdiction under 28 U.S.C. § 1332(a)(1), state citizenship is the equivalent of domicile. *Crowley v. Glaze*, 710 F.2d 676, 678 (10th Cir. 1983). "To effect a change in domicile, two things are indispensable: First, residence in a new domicile, and second, the intention to remain there indefinitely." *Id.*

It is Plaintiffs' burden, as the party invoking federal jurisdiction, to prove citizenship by a preponderance of the evidence. *See Cressler v. Neuenschwander*, 930 F.Supp. 1458, 1460 (D. Kan. 1996). An established domicile is presumed over a newly acquired one. *Ibid.* The place where a person lives is assumed to be his domicile, unless the evidence establishes the contrary. *Ibid.*

Beaty's Kansas residence on March 12, 2019, is undeniable. The DB Sports 2018 Annual Report, filed March 12, 2019, listed Beaty, the sole member of DB Sports, as having a Kansas address. This admission by Plaintiffs shows that Beaty had a Kansas residence on March 12, 2019.

Further, the DB Sports 2018 Annual Report identified Beaty as the resident agent of DB Sports, LLC, with a Kansas address. Limited liability companies must maintain in the state of Kansas a registered office and a resident agent for service of process. K.S.A. 17-7666(a). The only individual allowed to be a resident agent must be "an individual resident of the state of Kansas" whose business office is identical with the LLC's

registered office. K.S.A. 17-7666(a)(2). Again, this admission by Plaintiffs shows that Beaty, as the resident agent of DB Sports LLC, was a Kansas resident on March 12, 2019.

These facts in DB Sports LLC's Annual Report, filed hours after the filing of the Complaint, sufficiently show that Beaty was a resident of Kansas, domiciled in Kansas, and not a citizen of the State of Texas at the time Plaintiffs filed the Complaint.

Beaty claims that he is a citizen of Texas. Beaty has the burden of proving that he had a Texas residence in addition to his residence in Kansas, and that his domicile had changed as of March 12, 2019. If a party appears to have more than one residence, the courts look at the totality of the evidence to determine the party's domicile. *Cressler*, 930 F.Supp. at 1460. Courts often consider a variety of factors under this analysis, including:

1. Whether or not an individual votes where he claims domicile;
2. The manner in which an individual lives, taken in connection with his station in life, i.e., whether he rents or buys a home;
3. Whether his family and dependents have moved to the new residence;
4. Whether an individual's belongings have been moved to the new residence;
5. One's relationships with churches, clubs, and investments in the new residence;
6. Whether or not a place of abode is retained in the old state of residence;
7. Whether or not investments in local property or enterprise attach one to the former residence;
8. Whether one retains affiliations with professional, religious and fraternal life of the former community; and
9. What domicile is claimed for tax purposes.

*Ibid.*

These factors confirm that Beaty's domicile was in Kansas on March 12, 2019.

### a.  Voting

First, Beaty was registered to vote in Douglas County, Kansas, and he actually voted in Kansas during the November 2016 general election.

### b.  Manner of living

Beaty owns a home in Lawrence, Kansas, and has owned it since January 29, 2016. Beaty's ownership of a home in Kansas shows that his domicile is in Kansas.

### c.  Family and dependents location

Beaty owns a home in Lawrence, Kansas, with his wife. No discovery has been made regarding David Beaty's family or dependents, or their location or domicile as of March 12, 2019. If Plaintiffs claim that Beaty's wife or children under 18 were located other than in Lawrence, limited discovery on this issue will be necessary.

### d.  Belongings

Given that Beaty and his family reside in Lawrence, Kansas, it is presumed that Beaty's belongings are also located in Kansas. If Plaintiffs claim that Beaty's belongings were located other than in Lawrence, limited discovery on this issue will be necessary.

### e.  Relationships with churches, clubs, investments

Beaty's affiliation with any churches, clubs, or investments in Texas is unknown. If Plaintiffs claim that Beaty had such affiliations outside of Kansas, limited discovery on this issue will be necessary.

### f.   Place of Abode

Beaty maintains a place of abode in Kansas, which Beaty owns. Even if Beaty has a residence in Texas, this factor supports a Kansas domicile.

### g.   Investments in Kansas property or enterprises

Beaty is the sole member of DB Sports, LLC, a Kansas limited liability company. He owns real property in Lawrence, Kansas. He owns a watercraft in Douglas County, Kansas. Beaty's investments and ownership of Kansas property supports a Kansas domicile.

### h.   Affiliations with Kansas professional, religious and fraternal life

Beaty's affiliations with professional, religious, or fraternal organizations in Kansas or elsewhere are unknown.

### i.   Domicile claimed for tax purposes.

Beaty pays Kansas tax on his real estate and his personal property. It is unknown what domicile Beaty claimed when filing his 2018 state and federal taxes. If Plaintiffs claim that Beaty claimed a domicile other than Kansas for tax purposes, limited discovery on this issue will be necessary.

It cannot be disputed that Beaty was a Kansas resident on March 12, 2019. A consideration of the relevant factors shows that Beaty's domicile was in Kansas on March 12, 2019. Beaty and DB Sports are citizens of Kansas. There is no diversity of citizenship. Therefore, this lawsuit must be dismissed because this court lacks subject matter jurisdiction.

### 2. Kansas Athletics, Inc., Is an Arm of the State, Is Not a Citizen for Diversity Jurisdiction Purposes, and Is Entitled to Immunity from Suit in Federal Court under the Eleventh Amendment.

The federal courts lack subject matter jurisdiction in this matter not only based on the citizenship of Plaintiffs, but also because Kansas Athletics, Inc., is an arm of the State. As an arm of the State, diversity jurisdiction cannot be sustained because Kansas Athletics is not a citizen of any state. Further, Kansas Athletics is entitled to immunity from suit in federal court under the Eleventh Amendment.

### a. An arm of the State is not a citizen for purposes of diversity jurisdiction.

A State is not a 'citizen' for purposes of diversity jurisdiction. *Moor v. Alameda Cty.*, 411 U.S. 693, 717, 93 S. Ct. 1785, 1800, 36 L. Ed. 2d 596 (1973). A political subdivision of the State which is the arm or alter ego of the State is not a 'citizen' for purposes of diversity jurisdiction. *Ibid*.

The Tenth Circuit considers four primary factors to determine whether an entity is an "arm of the state."

> First, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state. Second, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control the state exercises over the entity. Third, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf. Fourth, we ask whether the entity in question is concerned primarily with local or state affairs. In answering this question, we examine the agency's function, composition, and purpose. [citations omitted].

*Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007) (citing

*Sturdevant v. Paulsen*, 218 F.3d 1160 (10th Cir. 2000)).

### b. An arm of the State is immune from suit in the United States District Court pursuant to the Eleventh Amendment.

Eleventh Amendment immunity bars federal court suits against a state without the

state's consent. "Eleventh Amendment immunity extends to states and state entities but

not to counties, municipalities, or other local government entities." *Steadfast Ins. Co. v.

Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007). Immunity extends to any entity

that is an "arm of the state." *Ibid*.

Courts use the same test to determine whether an entity is an arm of State for both

Eleventh Amendment immunity applicability and diversity of citizenship evaluations.

*Kansas State Univ. v. Prince*, 673 F.Supp.2d 1287, 1299 (D. Kan. 2009).

### c. Kansas Athletics is an arm of the State.

Kansas Athletics, Inc., is an arm of the State of Kansas. The University of Kansas,

as a state university, functions as an arm or alter ego of the State of Kansas. *Brennan v.

Univ. of Kan.*, 451 F.2d 1287, 1290 (10th Cir. 1971); *Board of Regents v. Hamilton*, 28

Kan. 376 (1882); *Murray v. State Board of Regents*, 194 Kan. 686, 401 P.2d 898 (1965).

Institutions serving the state universities are also arms or alter egos of the State of

Kansas. *Brennan*, 451 F.2d at 1290 (holding that the University Press of Kansas is an arm

of the State); *Ellis v. University of Kansas Medical Center*, 163 F.3d 1186, 1195 (10th

Cir. 1998) (holding that the University of Kansas Medical Center is an arm of the State).

Although Kansas Athletics is a corporation, it may still be an arm of the state. *See Kansas State University v. Prince*, 673 F.Supp.2d 1287, 1299 (D. Kan. 2009).

The federal court in this district has on several occasions considered, but not ultimately decided, whether particular university affiliated non-profit corporations are arms of the state. *Moore v. University of Kansas*, 124 F.Supp.3d 1159 (D. Kan. 2015) (finding that factual record was incomplete to find that Kansas University Center for Research was an arm of the state); *Prince*, 673 F.Supp.2d 1287 (finding that the Intercollegiate Athletic Council of Kansas State University, Inc. (IAC) may be an arm of the state); *Teichgraeber v. Memorial Union Corp. of the Emporia State University*, 946 F.Supp. 900 (D. Kan. 1996) (finding that the factual record was incomplete to find that Memorial Union was an alter ego of Emporia State University).

The facts, analyzed below under the *Steadfast* factors, show that Kansas Athletics is an arm of the State of Kansas based on state statutory and decisional law, its lack of autonomy, its dependence on the University of Kansas, and the scope of its purpose affecting state-wide rather than merely local concerns.

### i.  State Law

In addressing the character ascribed to the entity under state law, the court may consider state constitutional provisions, statutes and regulations as well as the holding of state courts. *Prince*, 673 F.Supp.2d at 1299 (citing *Harter v. Vernon*, 101 F.3d 334, 342 (4th Cir. 1996), *cert. denied*, 521 U.S. 1120, 117 S.Ct. 2511, 138 L.Ed.2d 1014 (1997)).

Kansas Athletics is a not-for-profit corporation, originally incorporated on July 16, 1925. It is subject to the corporation laws of the State of Kansas, K.S.A. 17-6001, *et seq.*, except as otherwise specifically provided in its Articles of Incorporation.

Kansas statutes do not mention Kansas Athletics by name. However, a Kansas statute authorizes the University to substantially control a corporation with which it contracts for a purpose related to its operation or function. K.S.A. 76-721. The Kansas legislature "contemplated that a State University could 'substantially control' a corporation whose purpose is related to the university's function." *Moore v. University of Kansas*, 124 F.Supp.3d 1159, 1165 (D. Kan. 2015) (citing *Prince*, 673 F.Supp.2d at 1300).

A review of decisional law shows that this issue is a matter of first impression as it relates to Kansas Athletics. Kansas courts have found that Athletics Corporations associated with other state universities are arms of the state. *Shriver v. Athletic Council of Kansas State Univ.*, 222 Kan. 216, 219, 564 P.2d 451, 453 (1977) (finding that the Athletic Council is an instrumentality of Kansas State University); *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1058, 934 P.2d 121, 136 (1997) (finding that the athletics corporation of Wichita State University is a governmental entity).

In *Shriver*, the Kansas Supreme Court examined the documents of the Athletic Council of Kansas State University, Inc., including the agreement between the Athletic Council and the university, affidavits regarding the operation of the Athletic Council, and the policies impacting the Athletic Council. The court found that the Athletic Council was "completely dominated by and is operated as an integral part of the University. In

fulfilling the duties entrusted to it, and in its every activity and function, it is subject to the policy and control of the University." *Shriver*, 222 Kan. at 219.

In *Gragg*, the Kansas Supreme Court held that the athletics corporation "is an integral part of WSU, as it is controlled and operated by its employees and enjoys the same privileges as WSU." *Gragg*, 261 Kan. at 1058.

And under the analyses in *Moore* and *Prince*, the courts found that this factor favored a finding that the university-affiliated non-profit was an arm of the State of Kansas. *Moore*, 124 F.Supp.3d at 1164-66; *Prince*, 673 F.Supp.2d at 1299-1301.

The same analysis applies to Kansas Athletics. It is a substantially controlled university affiliated non-profit created pursuant to K.S.A. 76-721. Its primary purpose is "to develop intercollegiate athletic teams composed of students at the University of Kansas and to schedule and manage intercollegiate athletic contests, all in harmony with and subject to the general educational policies of the University of Kansas, and the Constitution of the National Collegiate Athletic Association."

Under the policies of the Kansas Board of Regents ("KBOR"), Kansas Athletics is a university controlled affiliated corporation. "Affiliated corporations are incorporated entities, whether controlled or non-controlled by the university, that are funded solely or primarily by monies other than state funds and the purpose of which is to enhance or support the mission and activities of a state university." Affiliated corporations include, but are not limited to, alumni associations, incorporated student unions, endowment associations or foundations, and athletic corporations. (*Id.*) Controlled affiliated corporations must meet one of two criteria:

      (1) A majority of a quorum of the board of directors, or other committee charged with making decisions on behalf of the corporation, are university personnel or appointed by the state university chief executive officer, or

      (2) The corporation is otherwise controlled by the university or the university chief executive officer, as determined by the following considerations.

           (a) Does the university chief executive officer appoint voting members to the corporation's organizational committee (i.e. executive committee, finance committee, audit committee, etc.)?

           (b) Does the university chief executive officer designate, appoint or hire the corporation's executive director/chief executive officer?

           (c) To what extent does the university chief executive officer have control over the management of the corporation's day to day operations as well as control of its major decision making processes?

           (d) To what extent are public funds used to fulfill the corporation's responsibilities and mission?

Kansas Athletics meets the test for a controlled affiliated corporation. Six of the seven Directors are University personnel. This is much greater than the "majority of a quorum" (here, that number is three) required under the first criteria under the KBOR policy. Kansas Athletics conducts itself as a controlled affiliated corporation. In compliance with K.S.A. 76-721 and pursuant to the Operating Agreement, the books of Kansas Athletics are public records. Kansas Athletics conducts an annual independent audit.

Furthermore, the Kansas Attorney General has examined Kansas Athletics specifically and has opined that Kansas Athletics is considered a governmental entity

{L0069114.4 }

28

subject to the Kansas Open Records Act. K.S.A. 45-201, *et seq.*; Kan. Att'y Gen. Op. No. 80-118.

Under Kansas statutes and decisional law, Kansas Athletics is a corporation whose operations are substantially controlled by the University. This factors favors finding Kansas Athletics to be a governmental entity and an arm of the State.

### ii.  Autonomous v. dependent nature

To determine the extent of the State's control over Kansas Athletics, the court should consider the entity's articles of incorporation, its contract with the University, its by-laws, and affidavits. *Prince*, 673 F.Supp.2d at 1301.

As defined by state law and KBOR policy, discussed above, Kansas Athletics is substantially controlled by the University. Under the analyses in *Moore* and *Prince*, the courts found that this factor also favored a finding that a controlled affiliated corporation of a university was an arm of the State of Kansas. *Moore*, 124 F.Supp.3d at 1166-68; *Prince*, 673 F.Supp.2d at 1301-03.

Kansas Athletics was originally incorporated under the name "The University of Kansas Physical Education Corporation" through its charter filed with the Kansas Secretary of State on July 16, 1925. It is a not for profit corporation whose stated purposes include:

- to develop intercollegiate athletic teams composed of students at the University of Kansas and to schedule and manage intercollegiate athletic contests, all in harmony with and subject to the general educational policies of the University of Kansas, and the Constitution of the National Collegiate Athletic Association;
- to collect and own the receipts from such contests and such other moneys and goods as may be given or granted to the Corporation;

- to expend and disburse such receipts, gifts, and grants in the interests of the intercollegiate athletic program at the University of Kansas;
- to borrow money for the aforesaid purposes;
- to own and lease, either or both, such real and personal property, either or both, as is necessary, proper, or advisable for the aforesaid purposes; and
- in general, to do any and all things incidental to or necessary, proper, or advisable for the carrying out of its purposes aforesaid.

The Operating Agreement between the University and Kansas Athletics provides that Kansas Athletics will operate the intercollegiate athletic program as a division of the University. The activities of Kansas Athletics benefit the University, as Kansas Athletics is performing a task that the University would otherwise perform.

The Board of Directors of Kansas Athletics, with the exception of the elected Student Body President, are University employees. The Board sets policy for Kansas Athletics, determines the method of conducting the business of the Kansas Athletics, and makes recommendations to the Chancellor regarding the annual budget of Kansas Athletics.

The Chancellor serves as the Chairperson of the Board. The Chancellor has ultimate responsibility and final authority for the conduct and administration of all aspects of the athletics program. The Chancellor may cause Kansas Athletics to proceed as he or she determines to be in the best interest of the athletics program and the University, notwithstanding decisions made by the Board of Directors.

Kansas Athletics is closely tied to and controlled by the University. The State of Kansas, through the University and the Kansas Board of Regents, exercises significant supervision and control over the internal and external affairs of Kansas Athletics. This

lack of autonomy by Kansas Athletics and dependence on the University of Kansas favors finding Kansas Athletics to be an arm of the State.

### iii. **Finances**

Under the analyses in *Moore* and *Prince*, it would be difficult for any university affiliated entity to show that the State treasury would liable for any debt or liability of the affiliated entity. Kansas Athletics is no different.

However, when studying the entity's finances and evaluating the amount of state funding the entity receives, the court should consider not only direct funding but also funds obtained from rights granted to the entity. Kansas Athletics receives funds directly from the University, an amount totaling $1,502,799 in Fiscal Year 2018.

Kansas Athletics also receives funds based on rights the University has granted in the Operating Agreement, as amended. For example, under the Operating Agreement, Kansas Athletics is entitled to the use and control of Memorial Stadium, Allen Field House, and many other University facilities. The University has granted that all of the gate receipts for intercollegiate athletic events, all donations to Kansas Athletics, all student activity fees allocated to Kansas Athletics, and all other income of Kansas Athletics will be the property of Kansas Athletics to defray the cost of operating, improving and maintaining the intercollegiate athletic program of the University and to defray the cost of operating, and of constructing, improving and maintaining facilities for the intercollegiate athletic program.

Based on these agreements, Kansas Athletics generated $20,581,056 in ticket sales and handling fees for Fiscal Year 2018. Contributions and grants totaled $27,549,851 in

Fiscal Year 2018. Kansas Athletics also generated revenue from the fact that it operated the intercollegiate athletic program for the University, resulting in $32,695,636 in NCAA and conference distributions for Fiscal Year 2018. This revenue is to defray the costs of operating the intercollegiate athletic program of the University.

Under amendments to the Operating Agreement, the University has given Kansas Athletics the right to operate the University's trademark licensing program, the right to enter agreements for apparel and media rights, and the exclusive right to sell concessions at intercollegiate athletic events held on the Lawrence campus. The University has agreed that the revenue that results from these activities is the property of Kansas Athletics in order to defray the cost of operating, improving, and maintaining the University's intercollegiate athletics program. Sponsorship and royalties totaled $16,513,684 in Fiscal Year 2018.

These funds would not be generated apart from the fact that Kansas Athletics is performing work on behalf of the University, and ultimately, the State of Kansas. Were it not for the rights granted by the University, these funds would undoubtedly be considered State funds.

Funds coming directly from the University and funds flowing directly from rights granted by the University could be significantly affected by a judgment against Kansas Athletics. Kansas Athletics is able to obtain the Operating Revenues it has because it is uses facilities owned by the State and has been granted certain rights by the University, to fulfill matters of concern for the University, namely the operation of the University's intercollegiate athletics program.

These financial arrangements and the rights granted by the University leading to the operating revenue of Kansas Athletics show that the Kansas Athletics is an arm of the State. However, even if the court disagrees, this is only one of four factors and is not dispositive of the analysis.  And for purposes of diversity analysis under § 1332, the impact on the state treasury is particularly not as relevant. *Prince*, 673 F.Supp.2d at 1305 (citing *Maryland Stadium Authority*, 407 F.3d 255, 262, n. 11 (4th Cir. 2005)).

### iv. <u>State or Local Concern</u>

The work and purpose of Kansas Athletics is of state-wide concern rather than merely local concern. The supervision, maintenance and operation of intercollegiate athletic activities at the University of Kansas, which is part of the Big 12 athletic conference, is not primarily concerned with local matters. *See Prince*, 673 F.Supp.2d at 1305; *see also Moore*, 124 F.Supp.3d at 1170 (KUCR's work for the University of Kansas concerned state affairs, not local issues). This factor strongly points to a finding that Kansas Athletics is an arm of the State.

Overall, the facts support a finding that Kansas Athletics is an arm of the state, both for purposes of citizenship under §1332 and Eleventh Amendment immunity.

### d.  Kansas Athletics has not waived immunity or consented to suit in federal court.

Although Kansas has generally authorized suits against any state educational institution brought in state court, K.S.A. 76-713, it has not expressly consented to suits in federal court. *Ellis*, 163 F.3d at 1195. Kansas Athletics has not waived its constitutionally protected immunity from suits in federal court. Plaintiffs' claims are brought pursuant to

state law, and not under any federal statute by which Congressional abrogation of immunity has been recognized. Therefore, Kansas Athletics, as an arm of the State of Kansas, is entitled to Eleventh Amendment immunity.

### B. Plaintiffs' claim under the Kansas Wage Payment Act fails to state a claim upon which relief can be granted.

In considering a motion to dismiss pursuant to Rule 12(b)(6), the court must accept Plaintiffs' allegations as true, even if some or all of the relevant allegations would be disputed by Kansas Athletics. The court's analysis at this stage is not to determine the veracity of the Plaintiffs' claims but whether the allegations are legally sufficient to support the cause of action.

Plaintiffs state that Kansas Athletics entered contracts with Beaty and DB Sports. (Doc. 1, ¶¶ 25-30). Plaintiffs attach copies of those contracts and amendments to the Complaint. (Doc. 1-1 through 1-4, Exhibits A-D.) The contracts are part of the pleading for all purposes. Fed. R. Civ. P. 10(c).

Plaintiffs state that Kansas Athletics terminated Beaty effective November 24, 2018. (Doc. 1, ¶ 49). Plaintiffs state that at the time of the termination, the termination was not for cause and that Kansas Athletics agreed to pay liquidated damages payments consistent with Section 12 of the amended Employment Agreement and Section 7(D) of the amended Professional Services Agreement. (Doc. 1, ¶ 49). Plaintiffs state that on December 14, 2018, Kansas Athletics notified Beaty of an investigation of potential NCAA rules violations, and that payments would be withheld until it could evaluate the results of the investigation and determine whether Beaty's termination would be

classified as with or without cause. (Doc. 1, ¶¶ 55-56). Plaintiffs state that Kansas Athletics has a contractual obligation to pay Beaty $3,000,000. (Doc. 1, ¶ 12.). Plaintiffs state that as of the date of the Complaint, Kansas Athletics has not paid all wages due to Beaty. (Doc. 1, ¶ 79).

The Kansas Wage Payment Act, K.S.A. §§44-313 through 44-327, provides a mechanism to enforce the payment of wages, but not the payment of non-wages. The amounts contemplated as liquidated damages under the contracts are not wages under the Kansas Wage Payment Act.  Wages are defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time task, piece, commission or other basis less authorized withholding and deductions." K.S.A. 44-313.

The operative document is the 2016 Beaty Amendment, attached as Exhibit B to the Complaint. First, the 2016 Beaty Amendment specifies amounts owed to DB Sports upon early termination without cause:

> In the event that [Beaty's] employment is terminated without cause pursuant to Section 12 of this Agreement, [DB Sports] shall be entitled to a payment under this Section 7 in the total amount of $2,580,000.00 payable in six equal installments commencing on the last day of the month immediately following the month in which the termination date occurs and continuing on the last day of each succeeding month thereafter; the payments under this Section 7 and under Section 12 shall be considered as Liquidated Damages with no other sums or damages of any kind whatsoever paid by Athletics to Contractor.

(Doc. 1-2, Amendment to Section 7(D) of the 2014 Beaty Contract).

The 2016 Beaty Amendment also specifies amounts owed to Beaty upon early termination without cause:

A. Athletics shall have the right to terminate this Agreement without cause at any time upon written notice to [Beaty]. In the event Athletics terminates this Agreement without cause, Athletics, in addition to all amounts due and owing under this Agreement up to the date of termination, shall be liable to [Beaty] for a Liquidated Damages total payment of $420,000.00 payable in six equal installments; other than payments under Section 7 and payments under this Section 12, no other sums or damages of any kind whatsoever shall be paid by Athletics to [Beaty].

B. The Liquidated Damages above shall be paid to [Beaty] in six equal monthly installments commencing on the last day of the month immediately following the month in which the termination date occurs and continuing on the last day of each succeeding month thereafter.

C. The parties agree that such Liquidated Damages are in lieu of all other compensation and benefits owed to [Beaty], including annual and sick leave, otherwise owed to [Beaty] under any and all other provisions of this Agreement; and further constitute reasonable compensation for losses that [Beaty] will incur and are not a penalty.

(Doc. 1-2, Amendment to Section 12 of the 2014 Beaty Contract).

The liquidated damages contemplated by the 2016 Beaty Amendment are in lieu of all compensation or benefits that would be owed to Beaty and DB Sports if termination had not occurred. The liquidated damages are not wages. Beaty and DB Sports ceased providing services to Kansas Athletics effective November 24, 2018. Beaty and DB Sports would not have to provide any services to be eligible for payment of the liquidated damages. *See Fatouhi v. Mobile RF Sols., Inc.*, No. 15-2587-JWL, 2015 WL 3397205, at *5 (D. Kan. May 26, 2015). A lump-sum severance payment that is in no way tied to continued employment, that is not earned over the course of employment, and that requires no services in exchange for the payment is not wages under the Kansas Wage

Payment Act. *Firestone v. Hawker Beechcraft Int'l Serv. Co.*, No. 10-1404-JWL, 2012 WL 683286, at *17 (D. Kan. Mar. 2, 2012).

Further, the payment of $2,580,000 to DB Sports contemplated by the amendment to Section 7(D) are certainly not wages for the additional reason that DB Sports is not an employee of Kansas Athletics. The 2015 DB Sports Contract clarifies that DB Sports is an independent contractor, and not an agent of Kansas Athletics or the University.

The 2016 Beaty Amendment states that "Contractor shall be entitled to a payment" (Doc. 1-2, Amendment to Section 7(D)). Plaintiffs misquote the amendment to Section 7(D) by stating that the payment is owed to Beaty. (Doc. 1, ¶ 28). Contractor is defined in Section 7(A) as DB Sports. (Doc. 1-2, Amendment to Section 7(A)). Anyone acting on behalf of DB Sports under the contract is an agent, employee, or subcontractor of DB Sports. If Beaty provided professional services under that contract, it would be as an employee or agent of DB Sports, not as an employee of Kansas Athletics or the University.

Plaintiffs therefore state no viable claim under the KWPA for the $2,580,000 payment contemplated to DB Sports or the $420,000 payment contemplated to David Beaty, and that claim should be dismissed.

## V.  CONCLUSION

The federal courts do not have jurisdiction over this case, which involves only state law claims. The facts show that there is no basis for diversity jurisdiction because Plaintiffs are both citizens of Kansas and because Kansas Athletics, as an arm of the State of Kansas, is not a citizen of any state. The facts also show that Kansas Athletics, as an

arm of the State of Kansas, is immune from suit in federal courts under the Eleventh Amendment. For these reasons, the court should dismiss this case.

To the extent the court finds that it has jurisdiction, the court must dismiss Plaintiffs' claim under the Kansas Wage Payment Act for failure to state a claim upon which relief can be granted. The contracts at issue clearly show that any payment owed to Plaintiffs after termination are liquidated damages, not wages. Additionally, any payments owed to DB Sports are payments owed to an independent contractor, not an employee. Therefore, the court must dismiss Plaintiffs' claim under the Kansas Wage Payment Act.

Respectfully submitted,

/s/ Eric J. Aufdengarten
Eric J. Aufdengarten  #21289
Associate General Counsel and
Special Assistant Attorney General
The University of Kansas
245 Strong Hall, 1450 Jayhawk Blvd.
Lawrence, Kansas 66045
Tel: (785) 864-3276
Fax: (785) 864-4617
eja@ku.edu
*Counsel for Defendant Kansas Athletics, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that a true and correct copy of this document was filed through the Court's CM/ECF filing system on the 17th day of May, 2019 which generated a Notice of Electronic Filing to the following counsel:

James D. Griffin
Brent N. Coverdale
Scharnhorst Ast Kennard Griffin, PC
1100 Walnut, Suite 1950
Kansas City, MO  64106-2143
jgriffin@sakg.com
bcoverdale@sakg.com
*Counsel for Plaintiffs*

/s/  Eric J. Aufdengarten
Eric J. Aufdengarten
*Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | | |
|---|---|---|
| DAVID BEATY and | ) | |
| DB SPORTS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-02137** |
| | ) | |
| KANSAS ATHLETICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**INDEX OF EXHIBITS TO MOTION TO DISMISS**
**WITH SUPPORTING MEMORANDUM**

| Exhibit | Description |
|---|---|
| A | Affidavit of Lori Haaga |
| B | Certified DB Sports 2018 Annual Report 5-12-19 |
| C | Certified Corporation Warranty Deed 109 Fall Ridge Ln Lawrence KS |
| D | Personal Property Registration 109 Fall Ridge Ln |
| E | Certified David Beaty Voting Registration Receipt and Voting History |
| F | Affidavit of Frank Reeb |
| G | David Beaty Address Change Email 3-12-16 |
| H | Kansas Athletics Human Resources Screen for David Beaty 5-16-19 |
| I | Affidavit of Diane Goddard |
| J | Certified Kansas Athletics Articles of Incorporation |
| K | Kansas Athletics Bylaws 2-7-13 |
| L | Kansas Athletics Amendment to Bylaws 9-5-18 |
| M | Operating Agreement 12-1-88 |
| N | First Amendment to Operating Agreement 10-1-95 |
| O | Second Amendment to Operating Agreement 7-1-07 |
| P | Third Amendment to Operating Agreement 7-1-10 |
| Q | Excerpts of Kansas Athletics Independent Audit Report 2018 |
| R | Excerpts of Board of Regents Policy Manual |

Respectfully submitted,


/s/ Eric J. Aufdengarten
Eric J. Aufdengarten  #21289
Associate General Counsel and
Special Assistant Attorney General
The University of Kansas
245 Strong Hall, 1450 Jayhawk Blvd.
Lawrence, Kansas 66045
Tel: (785) 864-3276
Fax: (785) 864-4617
eja@ku.edu
*Counsel for Defendant Kansas Athletics, Inc.*


Date:  May 17, 2019

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| **DAVID BEATY and** | ) | |
| **DB SPORTS, LLC,** | ) | |
| | ) | |
| Plaintiffs, | ) | **Case No. 2:19-CV-02137** |
| | ) | |
| v. | ) | |
| | ) | |
| **KANSAS ATHLETICS, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

### AFFIDAVIT OF LORI HAAGA

STATE OF KANSAS      )
                                      ) ss:
COUNTY OF DOUGLAS )

I, Lori Haaga, being first duly sworn, on oath, depose and state:

1. I am Director of Legal Administration with the Office of the General Counsel at the University of Kansas.

2. On April 30, 2019, I requested records from the Kansas Secretary of State regarding DB Sports, LLC. A certified copy of the 2018 Annual Report for DB Sports, LLC is attached as Exhibit B.

3. On May 8, 2019, I requested records from the Douglas County Register of Deeds regarding the real property commonly known as 109 Fall Ridge Lane, Lawrence, Kansas. A certified copy of the most recent recorded deed for 109 Fall Ridge Lane, Lawrence, Kansas, is attached as Exhibit C.

4. On May 8, 2019, I requested records from the Douglas County Appraiser regarding personal property associated with 109 Fall Ridge Lane, Lawrence, Kansas. The Douglas County Appraiser provided me a copy of the record of a watercraft owned by David Beaty and Raynee Beaty, located at 109 Fall Ridge Lane, Lawrence, Kansas. A copy of the Beatys' watercraft record is attached as Exhibit D.

{L0069292.3 }

5. On May 8, 2019, I requested records from the Douglas County Clerk regarding David Beaty's voting registration and voting record. The Douglas County Deputy County Clerk provided me a certified copy of David Beaty's voting registration receipt and voter record, which is attached as Exhibit E.

6. I declare under penalty of perjury that the foregoing is true and correct.


By: *Lori Haaga*
Lori Haaga
Director of Legal Administration


STATE OF KANSAS      )
                     ) ss.
COUNTY OF DOUGLAS )


Signed before me this 16th day of May, 2019, a notary public in and for the county and state aforesaid, pby Lori Haaga, Director of Legal Administration with the Office of the General Counsel for the University of Kansas, who is personally known to me to be the same person who executed the within and foregoing document.


*Toni R. McMillen*
Notary Public

My appointment expires  11/21/2020

# Limited Liability Company Annual Report



1. LLC Name: DB SPORTS L.L.C.
2. Business Entity ID No.: 7899412
3. Tax Closing Date: December 2018
4. State of Organization: KS
5. Official Mailing Address:
   David Beaty, 109 Fall Ridge Ln, Lawrence KS 66049

6. Members who own 5% or more of capital (Kansas LLCs only):

   David Beaty - 109 Fall Ridge  Lawrence, KS 66045

Federal Employer Identification Number (FEIN): 0000000000

"I declare under penalty of perjury pursuant to the laws of the state of Kansas that the foregoing is true and correct."

Executed on March 12 2019

Signature of Member: David Beaty

Electronic File Stamp
Information:

Filed

* Date: 03/12/2019
* Time: 10:19:10 PM



I hereby certify this to be a true and
correct copy of the original on file.
Certified on this date: April 30, 2019
SCOTT SCHWAB
Secretary of State  Scott Schwab

EXHIBIT B

ENTERED IN TRANSFER RECORD IN MY
OFFICE ON 2/3/2016, COUNTY CLERK



**Douglas County Register of Deeds**

**Book: 1132  Page: 1189-1190**

Receipt #: 475848                          Total Fee: $26.00
Pages Recorded: 2      Authorized By  *Kay Pesnell*

Date Recorded: 2/3/2016 10:20:07 AM
[ELECTRONICALLY FILED]

THIS IS A TRUE AND CORRECT COPY OF THE
OFFICIAL RECORD ON FILE IN DOUGLAS
COUNTY REGISTER OF DEEDS OFFICE.
CERTIFIED ON ___May 8, 2019___
_____Kay Pesnell_____
KAY PESNELL
REGISTER OF DEEDS



Continental Title:  16205729



6540-983

## CORPORATION WARRANTY DEED
(Kansas Form for Corporations)

THIS INDENTURE, made this 29ᵗʰ day of ___January___, 2016 between **Jason Todd Construction, LLC, a Kansas limited liability company**, a corporation duly organized, incorporated and existing under and by virtue of the laws of the State of Kansas and having its principal place of business at **125 N Fall Creek Dr, Lawrence, KS 66049**, in the State of Kansas, party of the first part and, **David Beaty and Raynee Beaty, AKA Raynee M Beaty**, husband and wife, as joint tenants with the rights of survivorship, of **Douglas** County, in the State of **Kansas** in consideration of the sum of TEN DOLLARS AND OTHER VALUABLE CONSIDERATIONS, the receipt whereof is hereby acknowledged, does by these presents, grant, bargain, sell and convey unto said parties of the second part, their successor and assigns all of the following described real estate, situated in the County of **Douglas** and State of **Kansas**; to-wit:

**Lot 2, in a Replat of Lots 8, 9, 10 & 11, Block One Fall Creek Farms, 10th Plat, a subdivision in the City of Lawrence, Douglas County, Kansas.**

Subject to easements, reservations, restrictions, and covenants, if any, of record.

TO HAVE AND TO HOLD THE SAME, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in any wise appertaining forever.

And said party of the first part, for itself, and its successors and assigns, does hereby covenant, promise and agree, to and with said party(ies) of the second part, that at the delivery of these presents, it is lawfully seized in its own right of an absolute and indefeasible estate of inheritance, in fee simple, of and in all and singular the above granted and described premises, with the appurtenances; that the same are free, clear, discharged and unencumbered of and from all former and other grants, titles, charges, estates, judgments, taxes, assessments and encumbrances, of what nature and kind so ever, and that it will

WARRANT and FOREVER DEFEND the same unto said party(ies) of the second part, his/her/their heirs and assigns, and all and every person or persons whomsoever, lawfully claiming or to claim the same.

**EXHIBIT C**

Book: 1132 Page: 1190

IN WITNESS WHEREOF, said party of the first part has hereunto caused this Deed to be signed on its behalf by its **Managing Member**, thereunto duly authorized so to do, and to be attested by its **Managing Member, Jason Todd**, the day and year last above written.

**Jason Todd Construction, LLC**

Jason Todd, **Managing Member**

---

Notary Acknowledgment

State of KS

County of Dg
}ss.

On this 29 day of January, 2016, before me, the undersigned, a Notary Public in and for said county and state, Personally appeared **Jason Todd**, to me personally, who being by me duly sworn did say that he is the **Managing Member** of the **Jason Todd Construction, LLC** in the foregoing deed and said deed was signed in behalf of said Corporation by authority of its Board of Directors and said acknowledged said deed to be the free act and deed of said corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

My term expires: 5|17|2016

Notary Public:

Pamela Carnagie
Notary Public
State of Kansas
My Appt. Exp _____

## Legal Party Information

Notes | Tax Info | Refresh | Close

| | | |
|---|---|---|
| PIN: **1021868** | TAG: **City of Lawrence - 041** | Current owner: **BEATY DAVID** |
| AIN: | TIF: | Ownership type: **Not Specified** |
| Status: **Active** | County: **23-Douglas** | Situs address: **109 FALL RIDGE LN** |
| Geocode: | Case: | Description: **Watercraft** |
| Rev acct: **0000133932** | Pmt pin: | Class: **100 Watercraft** |
| Tax sale: | ACH pin: | Roll type: **Watercraft** |

### Legal Parties

| Party Name | Role | Percent of Ownership | Default Address | Communication Info | | |
|---|---|---|---|---|---|---|
| BEATY DAVID | Owner | | BEATY DAVID<br>109 FALL RIDGE LN<br>LAWRENCE KS 66049 | | Notes | Edit |
| BEATY RAYNEE M | Owner | | BEATY RAYNEE M<br>109 FALL RIDGE LN<br>LAWRENCE KS 66049 | | Notes | Edit |

EXHIBIT D

# Registrant Information Card

**Registrant #**   5280965

**Status** Active
**Status Reason**
**Registration Date** 10/20/2008
**How Reg** Motor Vehicle Offices

**MAILING ADDRESS**

Beaty, David

927 Drum Dr
Lawrence, KS 66049

**Precinct** 74.1
**Birth Date** 1970
**Party** Republican
**Gender** Male

**Reg Source** Motor Vehicle Offices
**Voter Needs Assistance**

**Reg ID**
**Optional Field 2**
**PWPosition**
**POLL**
**Drive Lic**
**Optional Field 6**
**Optional Field 7**
**Optional Field 8**
**Optional Field 9**

_____
**Signature of Voter**

# Registrant Receipt

**Registrant #**   5280965

**Status** Active
**Status Reason**
**Registration Date** 10/20/2008
**How Reg** Motor Vehicle Offices

**MAILING ADDRESS**

Beaty, David

927 Drum Dr
Lawrence, KS 66049

**Precinct** 74.1
**Birth Date** 1970
**Party** Republican
**Gender** Male

**Reg Source** Motor Vehicle Offices
**Voter Needs Assistance**

**Reg ID**
**Optional Field 2**
**PWPosition**
**POLL**
**Drive Lic**
**Optional Field 6**
**Optional Field 7**
**Optional Field 8**
**Optional Field 9**

Deputy County Clerk

EXHIBIT E

_____
**Signature of Voter**



| HOME | REGISTRATION INFORMATION | POLLING PLACE | | Select Language ▼ |
|------|--------------------------|---------------|--|-------------------|

# Registrant Search Information

## Registrant Detail

| | |
|---|---|
| **Name:** | David Beaty |
| **Address:** | 927 Drum Drive |
| | Lawrence, KS 66049 |
| **Party:** | Republican |
| **Precinct Code:** | 074 |
| **Precinct Name:** | 74 |
| **Polling Place:** | 08/06/2019 - 2019 City/School Primary |
| | 74 Sports Pavilion Lawrence |
| | 100 Rock Chalk Lane |
| | Lawrence, KS 66049 |

## Districts

| DISTRICT NAME | DISTRICT TYPE |
|---------------|---------------|
| Commission District 3 | County Commission |
| U.S. Representative 2 | U.S. Representative |
| Lawrence City | City Council |
| Clerk | Countywide |
| Treasurer | Countywide |
| Register of Deeds | Countywide |
| Attorney | Countywide |
| Sheriff | Countywide |
| Judicial District 7 | Judicial District |
| Kansas Representative 45 | KS Representative |
| Kansas Senate 2 | KS Senate |
| President / Vice President | President / Vice President |
| State Board of Education 4 | State Board of Education |
| School District 497 | School District |
| U.S. Senate | US Senate |
| Governor/Lt. Governor | Statewide |
| Secretary of State | Statewide |
| Attorney General | Statewide |
| Commissioner of Insurance | Statewide |
| State Treasurer | Statewide |

## Election Voting History

| ELECTION DATE | ELECTION NAME | TYPE | HOW VOTED |
|---------------|---------------|------|-----------|
| 2016-11-08 | 2016 General Election | General | Polling Place |
| 2008-11-04 | Kansas General Election | General | Provisional |

© Copyright 2019 ESSVR, LLC. All rights reserved.
® Voter View 3.3.1480.5

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| **DAVID BEATY and**<br>**DB SPORTS, LLC,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | Case No. 2:19-CV-02137 |
| **v.** | ) ) | |
| **KANSAS ATHLETICS, INC.,** | ) ) | |
| **Defendant.** | ) ) | |

## <u>AFFIDAVIT OF FRANK REEB</u>

STATE OF KANSAS      )
                             ) ss:
COUNTY OF DOUGLAS )

     I, Frank Reeb, being first duly sworn, on oath, depose and state:

1. I am the Assistant Athletic Director - Human Resources with Kansas Athletics, Inc. By virtue of my position, I have authority to certify the authenticity of the records identified below.

2. On March 11, 2016, David Beaty notified me that he moved into a new home with the address 109 Fall Ridge Ln, Lawrence KS. A copy of the email is attached as Exhibit G.

3. I received no further change of address from David Beaty.

4. Kansas Athletics uses a UltiPro database for Human Resource records, including any changes of address for employees. The most recent record for David Beaty shows an address of 109 Fall Ridge Ln, Lawrence Kansas. A copy of that record, with phone numbers redacted, is attached as Exhibit H.

**EXHIBIT F**

5. From March 11, 2016 to the present, the address on file with Kansas Athletics, Inc., for David Beaty has remained 109 Fall Ridge Lane, Lawrence, Kansas.

6. I declare under penalty of perjury that the foregoing is true and correct.

By: _____

Frank Reeb
Assistant Athletics Director -
Human Resources
Kansas Athletics, Inc.


STATE OF KANSAS          )
                         ) ss.
COUNTY OF DOUGLAS )

Signed before me this 16th day of May, 2019, a notary public in and for the county and state aforesaid, by Frank Reeb, Assistant Athletics Director - Human Resources for Kansas Athletics, Inc., who is personally known to me to be the same person who executed the within and foregoing document.


_____
Notary Public

My appointment expires 9/22/2019

ERIN N. SPURLOCK
NOTARY PUBLIC
STATE OF KANSAS

{L0069343.2 }

**Reeb, Frank**

| | |
|---|---|
| **From:** | Beaty, David |
| **Sent:** | Friday, March 11, 2016 8:54 AM |
| **To:** | Reeb, Frank |
| **Subject:** | New Address |

Frank,
We have moved into a new place. Our Address is 109 Fall Ridge Ln  Lawrence, Ks 66049.
Thanks,
Dave

1

EXHIBIT G

## David Beaty - 100978 - Kansas Athletics Inc

# Name, Address, and Telephone

| | |
|---|---|
| Name | David Beaty |
| Preferred | David |
| Former last | |
| Marital status | Married |
| Address | 109 Fall Ridge Ln<br>Lawrence, KS<br>66049<br>United States |
| Mailstop | |
| Primary Home Phone | ▓▓▓▓▓▓ (Private) |
| Primary Work Phone | |
| Work extension | |
| Primary e-mail | dbeaty@ku.edu |
| Alternate e-mail | |
| Distribution center | Kansas Athletics |

### Alternate Phone Numbers

| Type | Phone | Extension | Country | Country Prefix | Private |
|---|---|---|---|---|---|
| Cellular | ▓▓▓▓▓ | | United States | | |

EXHIBIT H

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| **DAVID BEATY and** | ) | |
| **DB SPORTS, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 2:19-CV-02137** |
| | ) | |
| **KANSAS ATHLETICS, INC.,** | ) | |
| **Defendant.** | ) | |

### AFFIDAVIT OF DIANE GODDARD

STATE OF KANSAS      )
                       ) ss:
COUNTY OF DOUGLAS )

I, Diane Goddard, being first duly sworn, on oath, depose and state:

1. I am Chief Financial Officer and Vice Provost for Finance of the University of Kansas and the Secretary / Treasurer of the Board of Directors of Kansas Athletics, Inc. I am a duly appointed custodian of business records for Kansas Athletics, Inc., and have authority to certify the authenticity of such records.

2. Kansas Athletics, Inc., was originally incorporated under the name "The University of Kansas Physical Education Corporation" by Charter filed with the Kansas Secretary of State on July 16, 1925. The name was later changed to The University of Kansas Athletic Corporation. On August 18, 2005, the name was changed to Kansas Athletics, Incorporated.

3. The most recent version of the Articles of Incorporation for Kansas Athletics, Inc., was effective June 21, 2011, as amended January 25, 2019. A certified copy of the Articles of Incorporation for Kansas Athletics, Inc., effective June 21, 2011, as amended January 25, 2019, is attached as Exhibit J.

4. The Bylaws of Kansas Athletics, Inc., were adopted June 11, 2004, and amended February 7, 2013. A copy of the Bylaws of Kansas Athletics, Inc., as amended February 7, 2013, is attached as Exhibit K.

**EXHIBIT I**

5. The Bylaws were further amended by resolution adopted by the Board of Directors on June 27, 2018. A copy of the Resolution is attached as Exhibit L.

6. The seven members of the Board of Directors of Kansas Athletics, Inc. are:
   - Doug Girod, Chancellor of the University of Kansas
   - Jeff Long, University of Kansas Director of Intercollegiate Athletics
   - Diane Goddard, University of Kansas Chief Financial Officer and Vice Provost for Finance;
   - Susan Stagg-Williams, University of Kansas Faculty Athletics Representative to the Big 12 Conference and Professor in the School of Engineering for Chemical & Petroleum Engineering
   - Carl Lejuez, University of Kansas Interim Provost and Executive Vice Chancellor;
   - Tammara Durham, Vice Provost for Student Affairs, University of Kansas, Lawrence campus
   - Tiara Floyd, President of the Student Body of the University of Kansas, Lawrence campus

7. The Student Body President is elected annually by the students of the University. The other members of the Board of Directors are employees of the University.

8. The Board of Directors recommends the annual budget for Kansas Athletics, Inc. The final approval of the annual budget rests with the Chancellor.

9. On December 1, 1988, The University of Kansas and The University of Kansas Athletic Corporation entered an agreement regarding their mutual responsibilities in the development and operation of, and in the use of the University facilities for, the University's intercollegiate athletic program ("Operating Agreement"). A copy of the Operating Agreement is attached as Exhibit M.

10. The Operating Agreement was amended October 1, 1995 ("First Amendment"). A copy of the First Amendment is attached as Exhibit N.

11. The Operating Agreement was further amended July 1, 2007 ("Second Amendment"). A copy of the Second Amendment is attached as Exhibit O.

12. The Operating Agreement was further amended July 1, 2010 ("Third Amendment"). A copy of the Third Amendment is attached as Exhibit P.

13. The University has granted that all of the gate receipts for intercollegiate athletic events, all donations to Kansas Athletics, all student activity fees allocated to Kansas Athletics, and all other income of Kansas Athletics will be the property of

Kansas Athletics to defray the cost of operating, improving and maintaining the intercollegiate athletic program of the University and to defray the cost of operating, and of constructing, improving and maintaining facilities for the intercollegiate athletic program. (Ex. M, § 5).

14. Kansas Athletics is entitled to the use and control of Memorial Stadium, Allen Field House, Allen Filed House Annex, Parrott Athletic Center, Shaffer-Holland Strength Center, the baseball field, the tennis courts at Allen Field House, the intercollegiate athletic practice areas, and Anschutz Sports Pavilion. (Ex. N, First Amendment § 1, amending § 2 of the Operating Agreement). The University has agreed to make other University facilities available to Kansas Athletics as may reasonably be necessary for the operation of the intercollegiate athletic program (Ex. N, First Amendment § 3, amending §4 of the Operating Agreement).

15. Kansas Athletics operates the University's trademark licensing program. (Ex. P, Third Amendment § 1).

16. Kansas Athletics also has the right to enter agreements for apparel and media rights for the benefit of the University's intercollegiate athletics program. Kansas Athletics has the exclusive right to sell concessions at intercollegiate athletic events held on the Lawrence campus. Unless otherwise agreed, the revenue from these activities is the property of Kansas Athletics to defray the cost of operating, improving, and maintaining the University's intercollegiate athletics program. (Ex. P, Third Amendment § 2).

17. The financial records of Kansas Athletics, Inc., are public records, subject to independent audit. The Independent Auditor's Report and Consolidated Financial Statements of Kansas Athletics, Incorporated and Subsidiary for Fiscal Year 2018 ("2018 Audit Report") was prepared by BKD, LLP.

18. A full copy of the 2018 Audit Report for Kansas Athletics, Inc. is available at https://kuathletics.com/documents/2018/11/30//KAI_Audit_Report_2018.pdf?id=1 5370. Relevant excerpts of the 2018 Audit Report for Kansas Athletics, Inc., are attached as Exhibit Q.

19. The 2018 Audit Report shows that for Fiscal Year 2018, Kansas Athletics received direct institutional support in the amount of $1,502,799; NCAA and conference distributions totaled $32,695,636; Contributions and grants totaled $27,549,851; Ticket sales and handling fees totaled $20,581,056; and Sponsorship and royalties totaled $16,513,684.

20. The 2018 Audit Report shows that the Total Operating Revenues for FY2018 was $104,411,118.

21. Kansas Athletics, Inc., is a controlled affiliated corporation under the policies promulgated by the Kansas Board of Regents.

22. A full copy of the Kansas Board of Regents Policy Manual is available at https://www.kansasregents.org/about/policies-by-laws-missions/board_policy_manual_2. Excerpts of relevant policies from the Board of Regents Policy Manual are attached as Exhibit R.

23. I declare under penalty of perjury that the foregoing is true and correct.

By: _____

DIANE GODDARD

Chief Financial Officer and
Vice Provost for Finance of the
University of Kansas

Secretary / Treasurer of the Board
of Directors of Kansas Athletics,
Inc.

Authorized Custodian of Records

STATE OF KANSAS          )
                         ) ss.
COUNTY OF DOUGLAS )

Signed before me this 16th day of May, 2019, a notary public in and for the county and state aforesaid, by Diane Goddard, Chief Financial Officer and Vice Provost for Finance of the University of Kansas, the Secretary / Treasurer of the Board of Directors of Kansas Athletics, Inc., and an authorized Custodian of Records for the University of Kansas, who is personally known to me to be the same person who executed the within and foregoing document.

_____
Notary Public

My appointment expires 11/21/2020

TONI K. McMULLEN
NOTARY PUBLIC
My Appt. Exp.
11-21-2020
STATE OF KANSAS

{L0069283.1 }

**AN**
**53-13**

KANSAS SECRETARY OF STATE

**Not-For-Profit Corporation**
**Certificate of Amendment**

| 2741 01 | FILED BY KS SOS |
| 053 013 | 07-21-2011 |
| $20.00 | 1 04:13:05 PM |
| | FILE#: 0338327 |

02987127

CONTACT: Kansas Office of the Secretary of State

Memorial Hall, 1st Floor
120 S.W. 10th Avenue
Topeka, KS 66612-1594

(785) 296-4564
kssos@sos.ks.gov
www.sos.ks.gov

ℹ **INSTRUCTIONS:** *All information must be completed or this document will not be accepted for filing.*
*Please read instructions before completing.*

**1. Business entity ID number:**
*This is not the Federal Employer ID Number (FEIN)*

0338327

**2. Name of the corporation:**
*Name must match the name on record with the Secretary of State*

Kansas Athletics Incorporated

**3. The articles of incorporation are amended as follows:**

See attached copy

**4. The amendment was adopted in accordance with the provisions of K.S.A. 17-6602 or K.S.A. 17-1608.**

**5. Future effective date:**
*A future effective date must be within 90 days of filing date*

☒ Upon filing

☐ Future effective date

| Month | Day | Year |

**6. I declare under penalty of perjury under the laws of the state of Kansas that the foregoing is true and correct and that I have remitted the required fee.**

*Signature of authorized officer*

07/13/2011
*Date (month, day, year)*

Theresa Gordzica
*Name of signer (printed or typed)*

ℹ **Instructions:**

☒ 1. Submit this form with the $20 filing fee.

**STAY UP-TO-DATE ON YOUR ORGANIZATION'S STATUS, ANNUAL REPORT DUE DATE AND CONTACT ADDRESSES BY GOING TO WWW.SOS.KS.GOV. UNDER QUICK LINKS, SELECT SEARCH BUSINESS ENTITY INFORMATION.**

**NOTICE:** *There is a $25 service fee for all checks returned by your financial institution.*
*All information must be completed or this document will not be accepted for filing.*

Page 1 of 1

K.S.A. 17-6602
K.S.A. 17-1608

EXHIBIT J

## AMENDED AND RESTATED ARTICLES OF INCORPORATION
## KANSAS ATHLETICS, INCORPORATED

(Originally incorporated under the name "The University of Kansas Physical Education
Corporation" by Charter filed with the Kansas Secretary of State on July 16, 1925)

The following Amended and Restated Articles of Incorporation, which restate, integrate,
and further amend the Corporation's charter as heretofore amended and supplemented, were duly
proposed and adopted by the Corporation's board and by its members at a regularly scheduled
meeting of such board and members duly called, convened, and held on June 21, 2011 all in
accordance with the provisions of the corporation laws of the State of Kansas (K.S.A. 17-6001 et
seq.), and, more particularly, in accordance with the provisions of K.S.A. 17-6602 and 17-6605:

ARTICLE FIRST: The name of this Corporation is "Kansas Athletics, Incorporated."

ARTICLE SECOND: The address of this Corporation's registered office in this state is
205 Wagnon Student Athlete Center, University of Kansas, Lawrence, Douglas County, Kansas
66045. The name of this Corporation's resident agent at such address is Sheahon Zenger.

ARTICLE THIRD: This Corporation is organized NOT for profit, and the purposes for
which it is formed are to develop intercollegiate athletic teams composed of students at the
University of Kansas and to schedule and manage intercollegiate athletic contests, all in harmony
with and subject to the general educational policies of the University of Kansas, and the
Constitution of the National Collegiate Athletic Association; to collect and own the receipts from
such contests and such other moneys and goods as may be given or granted to the Corporation; to
expend and disburse such receipts, gifts, and grants in the interests of the intercollegiate athletic
program at the University of Kansas; to borrow money for the aforesaid purposes; to own and
lease, either or both, such real and personal property, either or both, as is necessary, proper, or
advisable for the aforesaid purposes; and, in general, to do any and all things incidental to or
necessary, proper, or advisable for the carrying out of its purposes aforesaid. No part of the net
earnings of the corporation shall inure to the benefit of, or be distributable to its members,
directors, officers, or other private persons, except that the corporation shall be authorized and
empowered to pay reasonable compensation for services rendered and to make payments and
distributions in furtherance of the Corporation's purposes. No substantial part of the activities of
the Corporation shall be the carrying on of propaganda or otherwise attempting to influence
legislation, and the Corporation shall not participate in, or intervene in (including the publishing
or distribution of statements) any political campaign on behalf of or in opposition to any
candidate for public office. Notwithstanding any other provision of this document, the
Corporation shall not carry on any other activities not permitted to be carried on (a) by a
corporation exempt from federal income tax under section 501(c)(3) of the Internal Revenue
Code, or the corresponding section of any future federal tax code, or (b) by a corporation,
contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code, or
corresponding section of any future federal tax code.

ARTICLE FOURTH: This Corporation shall NOT have authority to issue capital stock.

ARTICLE FIFTH: The business of this Corporation shall be managed and its affairs shall be conducted by a Board of Directors, consisting of the Chancellor of the University of Kansas, the University of Kansas Director of Intercollegiate Athletics, the University Chief Business and Financial Planning Officer, the University's Faculty Athletics Representative to the Big 12 Conference, a Senior Administrator appointed by the University Provost, the University Vice Provost for Student Success, and the Student Body President of University of Kansas, Lawrence, campus. There may also be such non-voting members of the Board of Directors as are designated in the Corporation's Bylaws as from time to time amended.

The Chancellor of the University of Kansas has ultimate responsibility and final authority for the conduct and administration of all aspects of the athletics program and the Chancellor may cause the corporation to proceed as he or she determines to be in the best interest of the athletics program and the University, notwithstanding decisions made by the Board of Directors.

There shall also be established an Athletics Advisory Committee for Intercollegiate Athletics that will report to the Board of Directors and provide input to the Director of Intercollegiate Athletics. It will consist of the Board of Directors and such other persons as specified in the Bylaws as from time to time amended, but shall be constituted at all times consistent with the Constitution of the National Collegiate Athletic Association. The exact number of the Advisory Committee, their qualifications, the manner of their selection (whether by election, appointment or otherwise), and their terms of office shall be as specified in the Corporation's Bylaws as from time to time amended. The Advisory Committee shall meet and be available to advise, consult with, and upon request, recommend to the Board of Directors as to policies, procedures, and actions that will further the purposes of this Corporation. The Advisory Committee has no authority to govern the Corporation.

ARTICLE SIXTH: The seven directors of this Corporation shall constitute its only seven members, and all meetings of the Board of Directors and all action taken at such meetings shall automatically constitute meetings of and actions taken by the members of this Corporation. All conditions of membership in this Corporation, if any, other than those expressly set forth in these Articles of Incorporation, shall be specified in the Corporation's Bylaws as from time to time amended.

ARTICLE SEVENTH: The power to adopt, make, alter, amend, and repeal this Corporation's Bylaws and these Articles of Incorporation in whole or in part, at any time and from time to time, is hereby vested in the Board of Directors.

ARTICLE EIGHTH: This Corporation shall have perpetual existence.

ARTICLE NINTH: The corporation laws of the State of Kansas (K.S.A. 17-6001 et seq.) shall, except as otherwise specifically provided herein, apply to and govern this Corporation and its rights, obligations, and affairs.

-3-

IN WITNESS WHEREOF we have hereunto signed this instrument at Lawrence, Kansas, this 21st day of June, 2011.

Jerry Bailey
Chairman of the Board

ATTEST:

Secretary
Theresa Gordzica

ACKNOWLEDGMENT

STATE OF KANSAS )
                 ) ss:
COUNTY OF DOUGLAS )

The foregoing instrument was acknowledged before me this 21st day of June, 2011, by Jerry Bailey, Chairman of the Board of Kansas Athletics, Incorporated, for and on behalf of said Corporation.

Notary Public

My appointment expires:

2-14-2013

NOTARY PUBLIC - State of Kansas
JUDITH E. POTTORFF
My Appt. Exp. 2-14-13

# Kansas Secretary of State

## Resident Agent and/or Registered Office Amendment

- File Date: 2019-01-25
- File Time: 15:28:28

1. Business Entity Name:  KANSAS ATHLETICS, INCORPORATED
2. Business Entity Number:  0338327
3. Resident Agent: Jeffrey P Long
4. Registered Office: 205 WAGNON STUDENT ATHLETE CEN UNIVERSITY OF KANSAS LAWRENCE, KS  66045

"I declare under penalty of perjury pursuant to the laws of the state of Kansas that the foregoing is true and correct."

Executed on the 25 of January , 2019.

Diane Goddard
Authorized Officer

I, Scott Schwab, Secretary of State of Kansas, do hereby certify that this is the true and correct copy of the original document filed electronically on 25 of January , 2019.

Scott Schwab

To validate the authenticity of this electronically certified document please visit, https://www.kansas.gov/rora-amend/validate.do and enter the following authentication code: 382390



I hereby certify this to be a true and correct copy of the original on file.
Certified on this date: May 9, 2019
SCOTT SCHWAB
Secretary of State

**BYLAWS OF**
**KANSAS ATHLETICS, INCORPORATED**

## ARTICLE I - BOARD OF DIRECTORS

Section l.

a)      The property, business, and affairs of the Corporation shall be under the care and supervision of a Board of Directors of seven (7) members, such authority (including but not limited to the authority vested in the Board by Section 2 of this Article I) at all times to be exercised in a manner consistent with the principle of and to remain subject to the requirements of University control of varsity athletics, and more particularly, at all times to remain subject to and be exercised in accordance with the control of the Chancellor and the Board of Regents.

b)      The voting members of the Board shall include the following:

i)      The Chancellor of the University of Kansas

ii)      The University of Kansas Director of Intercollegiate Athletics;

iii)      The University of Kansas Chief Business and Financial Planning Officer;

iv)      The University of Kansas Faculty Athletics Representative to the Big 12 Conference (or its successor), appointed by the Chancellor;

v)      One (1) Senior University Administrator (the Provost or his/her designee) University of Kansas, Lawrence campus;

vi)      The Vice Provost for Student Success, University of Kansas, Lawrence campus; and

vii)      The President of the Student Body of the University of Kansas, Lawrence campus.

Section 2.

It shall be the purpose of the Board to support and foster as competitive an intercollegiate athletic program as is possible within the means available, all in harmony with and subject to the general educational policy of the University. To this end, the Board shall act as a policy-making body for the Corporation, shall determine, in general, the method of conducting the Corporation's business, and shall make recommendations to the Chancellor with regard to the Corporation's annual budget, including the compensation to be paid to Corporate officers, agents, and employees. The Board shall conduct the business of the Corporation in accordance with established principles of good business practices.  Such practices shall include submission of all compensation questions of highly compensated employees of the Corporation to the Compensation Committee for decisions, subject to final approval of the Chancellor.

EXHIBIT K

1

The Board shall have authority to purchase or contract for or to authorize any officer, agent, or employee to purchase or contract for any property or for the performance of any labor or service that the Board deems expedient, and shall have the authority to borrow money for the Corporation. Except for the authority to purchase real property, to borrow money or otherwise incur debt, to enter into agreements of a value in excess of $250,000, and except as otherwise specifically provided by law, the Articles of Incorporation or these Bylaws, the Board hereby delegates its authority to the Director of Intercollegiate Athletics for purposes of carrying out the day to day operations of the Corporation. The Board may, however, vote to provide standing authority to the Director of Intercollegiate Athletics to enter into such contracts as necessary to take advantage of potential business and hiring opportunities that may arise, including those in excess of $250,000 in value.

Section 3.

Vacancies on the Board shall be filled as expeditiously as is reasonably possible by the appropriate electing or appointing body or persons as specified in Section I of this Article I. A vacancy on the Board shall be deemed to exist in case of the death, resignation or loss of appropriate status of any Board member.

## ARTICLE II - BOARD MEETINGS

Section 1.

Regular meetings of the Board shall be held quarterly during the academic year, at such time and place as the Secretary may designate in the notice of the meeting. Special meetings of the Board may be held at any time and from time to time on call of the Chairperson or the Director of Intercollegiate Athletics, or by the Secretary upon written request of any two (2) members of the Board. In the event that a special meeting is called on request of two (2) members, as aforesaid, the Secretary shall designate in the notice of the meeting the time and place of the meeting on a date which shall be no less than seven (7) nor more than ten (10) calendar days following the receipt by the Secretary of such written request. Any business may be transacted at any Board meeting without specification in the notice thereof, except as otherwise provided by law, in the Articles of Incorporation or in these Bylaws.

Section 2.

Notice of all regular and special meetings of the Board shall be given to each Board member by any of the following methods, to-wit: by oral, telephonic or written notice (including notice by e-mail) served upon, given, sent or mailed to each member, with any such telephonic or mailed notice to be addressed to the members at their respective addresses as shown on the books of the Corporation. Meeting notices shall be given as aforesaid not less than ten (10) days before the date of each regular meeting, and not less than two (2) days before the date of each special meeting (except as otherwise provided in preceding Section I of this Article II with request to notice of any special meeting called upon the written request of at least two (2) Board members). Board members may waive any notice required by the Articles of Incorporation, these Bylaws or applicable laws, but such waivers must be in writing signed by the Board members. If

2

such waiver of notice is signed, any action taken by that Board member shall have the same effect as though the required notice had been sent.

Section 3.

A majority of the voting members of the Board, namely, four (4) voting members, shall constitute a quorum for the transaction of business, and, except as otherwise provided by law, the Articles of Incorporation or in the Bylaws, and a majority of the votes cast at any such meeting of the Board at which a quorum is present shall be decisive of any such action.

Members present at any meeting, though less than a quorum, may adjourn such meeting sine die or from time to time without notice other than by announcement at the meeting if the adjournment shall be to the following day, but, if the meeting shall be adjourned to a date later than the following day, then oral, telephonic, electronic or written notice of such adjourned meeting shall be duly served on or given, sent, or mailed to each member not less than two (2) days before the time set for such meeting. At any adjourned meeting at which a quorum is present any business may be transacted which might have been transacted at the meeting as originally called.

Section 4.

As provided in K.S.A. 17-6301 (f) as amended from time to time, the Board may take any action required or permitted to be taken at any meeting of the Board without a meeting if all voting members of the Board consent to such action in writing, and the written consents are then filed in the minutes of the Corporation.

## ARTICLE III -OFFICERS

Section 1.

The Chancellor of the University shall serve as the Chairperson of the Board. The Director of Intercollegiate Athletics shall serve as Chief Executive Officer of the Corporation. The Chief Business and Financial Planning Officer shall serve as the Secretary and Treasurer. The Senior University Administrator shall serve as the Vice-Chairperson, who shall serve as Chairperson in the absence of the Chairperson and shall perform such other duties as may be assigned by the Chairperson or the Board.

Section 2.

The Board may provide for the appointment of such additional officers with such duties as the Board deems to be for the best interest of the Corporation. Any such appointment may be terminated and such office so created may be abolished at the pleasure of the Board.

Section 3.

The Director of Intercollegiate Athletics shall be appointed by the Chancellor from

candidates recommended after a search directed by the Chancellor in consultation with the Board and other appropriate constituencies. The Director of Intercollegiate Athletics, as the Chief Executive Officer of the Corporation, shall have the general powers and duties of management generally vested in the office of the president of a corporation. The Director of Intercollegiate Athletics shall have authority and responsibility for the day-to-day operations of the Corporation including employment and termination of personnel, and in undertaking these duties shall observe the policies, goals, and objectives established by the Board. The Director of Intercollegiate Athletics shall be a member of the Compensation Committee, and may serve on other standing and ad hoc committees as appointed by the Board. The Director of Intercollegiate Athletics shall be responsible for the submission of each annual budget to the Board for its consideration and recommendations and for securing the Chancellor's approval of the recommendations.

Section 4.

The Chairperson shall be the official spokesperson or the consultant on action pending before or taken by the Board and shall preside over all regular and special Board meetings.

Section 5.

The Secretary/Treasurer shall have the care and custody of the corporate seal and of the minute books and documents of the Corporation, shall perform such duties as usually devolve upon the office of corporate secretary and such other duties as may be required of him/her by the Board at any time and from time to time.

The Secretary/Treasurer shall have custody of all money, valuable papers, and property of the Corporation, shall be responsible for the Corporation's books of account, shall make provisions for an annual audit of its books, and shall perform all such other duties as usually devolve upon the office of the corporate treasurer or as may be required of him/her by the Board at any time and from time to time.

The Secretary/Treasurer shall be responsible for ensuring that each new member of the Board is issued a letter of appointment specifying his or her duties as a board member. The Secretary/Treasurer shall be responsible for initiating appointment letters within thirty (30) days of selection of an individual for a position on the Board. Each appointment letter shall be reviewed, approved, and signed by the Chancellor.

Section 6.

In the event a vacancy occurs in any officer position for any reason, including but not limited to death, removal, resignation or abolition of position, the Chancellor is hereby authorized to appoint such person or people as he/she deems appropriate to perform the duties of said office until such time as a successor is selected as provided above.

## ARTICLE IV-FACULTY ATHLETICS REPRESENTATIVE

The Faculty Athletics Representative shall be a full-time member of the University staff of professorial rank whose pay is not primarily from athletics sources. After consultation with the University Faculty Senate, the Chancellor shall appoint the Faculty Athletics Representative as the representative of the University to the Big 12 Conference and to the National Collegiate Athletic Association.   The Faculty Athletics Representative shall serve at the pleasure of the Chancellor and, at the discretion of the Chancellor, may serve for an initial term of five years. Reappointment of the Faculty Athletics Representative shall be at the discretion of the Chancellor and may be for a term of five years or less. Should there become a need for a special or regular representative to any other athletic organization, the Chancellor may designate the Faculty Athletics Representative or another member of the Board to be such representative.

The Faculty Athletics Representative shall report to and, when appropriate, seek the advice of the Board on action taken or to be taken by or on matters pending before such Conferences and Associations. He/she shall routinely consult with the Director of Intercollegiate Athletics on the day-to-day conduct of matters subject to the regulatory powers of such Conferences and Associations and on matters bearing on the relation between the programs, activities, and personnel of the Corporation and other University programs, activities, and personnel. When the latter matters involve relations with the student body or with the student government structure, such consultation shall include the President of the Student Body or the President's designee from among the student members of the Athletics Advisory Committee (Article IX).

## ARTICLE V - COMMITTEES

Section 1.

Unless and until otherwise determined by the Board, there shall be two standing committees of the Corporation: a Compensation Committee and an Audit Committee.

Section 2

The composition of the Compensation Committee shall be:

- the Director of Intercollegiate Athletics,
- the Secretary/Treasurer,
- the Senior University Administrator
- the Chairperson.

If compensation of the Director of Intercollegiate Athletics is considered, the Director shall recuse himself/herself.

Meetings of the Compensation Committee may be held at any time and from time to time on call of the Chairperson or the Director of Intercollegiate Athletics, upon one-day's notice given to all Committee members in the same manner specified in Section 2 of Article II of these

Bylaws for giving notice to Board members of regular or special Board meetings and subject to the same provisions therein contained regarding waiver of notice. Three (3) Committee members present at any Compensation Committee meeting shall constitute a quorum for the transaction of business, and, except as otherwise provided by law, in the Articles of Incorporation, or in these Bylaws, a majority of votes cast at any Compensation Committee meeting at which a quorum is present shall be decisive of any action. Any action duly taken by the Compensation Committee with regard to compensation of a Corporation employee shall have the same force and effect in all respects as if duly taken by the full Board at a regular or special Board meeting duly called, convened, and held at which a quorum was present.

Section 3.

The composition of the Audit Committee shall be:

- the Secretary/Treasurer of the Board,
- another Board member, selected by the Board,
- the Chief Financial Officer of the Corporation,
- Two members who are neither employees nor on the Board of the Corporation. Their terms shall be three years except that one of such initial outside members shall be appointed for an initial term of two years. No such outside member shall serve more than two terms. Service of less than one year to complete an unexpired term shall not count toward the two term limitation.

Meetings of the Audit Committee may be held at any time and from time to time on call of the Secretary/Treasurer, upon one-day's notice given to all Committee members in the same manner specified in Section 2 of Article II of these Bylaws for giving notice to Board members of regular or special Board meetings and subject to the same provisions therein contained regarding waiver of notice. Three (3) Committee members present at any Audit Committee meeting shall constitute a quorum for the transaction of business, and, except as otherwise provided by law, in the Articles of Incorporation, or in these Bylaws, a majority of votes cast at any Audit Committee meeting at which a quorum is present shall be decisive of any action. Any action duly taken by the Audit Committee with regard to any audit matters shall have the same force and effect in all respects as if duly taken by the full Board at a regular or special Board meeting duly called, convened, and held at which a quorum was present.

The Audit Committee will interview and recommend selection of external auditors and receive the annual audit including the internal control letter and tax return. The Committee will review any matters relating to the not-for-profit status of the Corporation, the financial management systems, and the annual bond continuing disclosure documents.

Section 4.

At any time and from time to time, the Board of Directors may establish such additional ad hoc and standing committees as it deems necessary or advisable.

Section 5

All standing committees shall report to the Board and identify any matters in which they determine any actions or improvements are needed and report any actions taken.

## ARTICLE VI -INDEMNIFICATION OF OFFICERS AND BOARD MEMBERS

Section I.

Every person (and the heirs, executors and administrators of such persons) who is or was an Officer or Member of the Board of Directors may, in accordance with the second section of this Article, be indemnified by the Corporation against any and all liability and reasonable expense that may be incurred by him/her in connection with or resulting from any claim, action, suit or proceeding (whether brought by or in the right of the Corporation or otherwise), civil or criminal, or in connection with an appeal relating thereto, in which he/she may become involved, as a party or otherwise, by reason of his/her being or having been an Officer or Member of the Board or by reason of any action taken or not taken in his/her capacity as such Officer or Member of the Board, whether or not he/she continues to be such at the time such liability or expense shall have been incurred, provided he/she acted in good faith in what he/she reasonably believed to be the best interest of the Corporation and, in addition, with regard to any criminal action or proceeding, had no reasonable cause to believe that his/her conduct was unlawful. As used in this Article, the terms "liability" and "expense" shall include, but shall not be limited to, counsel fees and disbursements and amounts of judgments against, and amounts paid in settlement by, an Officer or Member of the Board; but shall not include fines or penalties imposed or counsel fees or other expenses incurred in any criminal proceeding resulting in such person's conviction. The termination of any claim, action, suit or proceeding, civil or criminal, by judgment, settlement (whether with or without court approval) or conviction or upon a plea of guilty or of nolo contendere or its equivalent, shall not create a presumption that an Officer or Member of the Board did not meet the standards of conduct set forth in this Article.

Section 2.

Every person (and the heirs, executors and administrators of such persons) referred to in the first Section of this Article who has been wholly successful, on the merits or otherwise, with respect to any claim, action, suit or proceeding of the character described in said first Section shall be entitled to indemnification as of right. Except as provided in the preceding sentence, any indemnification under such Section shall be made at the discretion of the Corporation, but only if (i) the Members of the Board acting by a quorum consisting of Members of the Board who are not parties to (or who have been wholly successful with respect to) such claim, action, suit or proceeding, shall find that the Officer or Member of the Board has met the standards of conduct set forth in such Section, or (ii) independent legal counsel (who may be regular counsel of the Corporation) shall deliver to the Corporation written advice that, in his or her opinion, such Officer or Member of the Board has met such standards.

7

Section 3.

Expenses incurred with respect to any claim, action, suit or proceeding of the character described in the first Section of this Article may be advanced by the Corporation prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the recipient to repay such amount unless it shall ultimately be determined that he/she is entitled to indemnification under this Article.

Section 4.

The foregoing rights to indemnification shall not be exclusive of any other rights to which the Officers or Members of the Board may be entitled according to law.

## ARTICLE VII -CONFLICTS OF INTEREST

All voting Members of the Board of Directors shall have, in addition to responsibility for compliance with the Board of Regents and the University of Kansas policies on conflicts of time and interest, responsibility for compliance with a Corporate Policy on Conflicts of Interest as set forth herein. This policy requires disclosure of any actual or potential conflicts of interest between the members' duties with the Board and their personal financial interests, including those of their immediate family members, including their spouses and their children, parents, siblings, grandparents, and grandchildren and the spouses of any of the foregoing. Board members shall provide Athletics' Corporate Counsel copies of their University Conflict of Interest form, filed each Fall semester with KU, and their Statement of Substantial Interests form, filed with the State of Kansas each Spring semester for those members who are required to file one. The Corporate Counsel shall review the filings and shall inform the Board of any actual or potential conflicts of interest.  Any member with an actual conflict of interest must recuse himself or herself from any further discussion, recommendation or action of the Corporation regarding the matter giving rise to the conflict. Any situation giving rise to the appearance of a conflict of interest similarly will be disclosed to the Board, which shall determine by a majority vote whether the member so involved must recuse himself or herself from further discussion, recommendation or action of the Corporation regarding the matter in question.

## ARTICLE VIII - AMENDMENTS

The Board of Directors may alter, amend, or repeal these Bylaws in whole or in any part, or may enact additional Bylaws, by the vote of a majority of the whole Board at any duly called, convened, and held Board meeting at which a quorum is present, provided intention to propose the alteration, amendment, or repeal of the Bylaws, in whole or in part, or the enactment of additional Bylaws, shall have been specified in the next preceding meeting or, even without any such notice, by the vote of two-thirds of all members of the Board.

## ARTICLE IX - ATHLETICS ADVISORY COMMITTEE

Section I.

a)       There shall be formed an Athletics Advisory Committee ("Advisory Committee"). The purpose of the Advisory Committee shall be to provide advice and recommendations to the Board of Directors and to Director of Intercollegiate Athletics, as further specified in the following paragraphs. The Advisory Committee shall have Twenty-seven (27) members, as enumerated below. The Advisory Committee shall be advisory in nature and shall not exercise corporate authority or control and shall not have fiduciary or fiscal responsibility for the operations of the Corporation. All actions of the Advisory Committee are subject to and not binding on the Director of Intercollegiate Athletics or the Board. No member of the Advisory Committee shall have voting authority in the matters of the Corporation, unless such member is also a voting member of the Board.

b)       The members of the Advisory Committee shall include the following:

   i)       The members of the Board of Directors, as specified in Article I;

   ii)       Six (6) full-time members of the University faculty elected by the faculty in accordance with the processes described in Article XII of the University Senate Code as now in effect and as hereafter amended. Each elected faculty member of the Advisory Committee shall serve for no more than two (2) terms of three (3) years' length. Serving not more than one (1) year of an unexpired term shall not be considered as serving a term under this limitation. Terms shall be staggered, two (2) faculty members being elected each year.

   iii)       Five (5) non-faculty alumni of the University appointed by the Board of Directors of the Alumni Association, having such qualifications, and representing such geographical areas, if any, as the Alumni Association Board of Directors shall determine. Each elected alumni member of the Advisory Committee shall serve for no more than two (2) terms of three (3) years' length. Serving not more than one (l) year of an unexpired term shall not be considered as serving a term under this limitation. Terms shall be staggered, one (1) or two (2) alumni members being elected each year.

   iv)       Three (3) student members of the student body appointed in accordance with Senate Rules and Regulations. Terms shall be one year in length.

   v)       The Athletics Senior Woman Administrator.

   vi)       One (1) representative from the full-time faculty or staff of the KU Medical Center to be appointed by the Chancellor.  The representative shall serve no more than two (2) terms of three (3) years' length.

9

vii)    Three (3) student-athletes appointed by the Student-Athlete Advisory Committee. Term shall be one year in length.

viii)    The treasurer of the Student Senate.

(c)    The Chairperson of the Advisory Committee shall be appointed annually by the Board and shall be a member of the Advisory Committee.

(d)    In making appointments to the Advisory Committee, maximum feasible effort shall be made to include women and minority persons in accordance with affirmative action principles and the provisions of the University's Affirmative Action Plan as from time to time amended. Regular yearly changes in the Advisory Committee membership shall become effective on May 15 of each year.

Section 2.

Decisions by the Advisory Committee to provide advice and recommendations shall be made by a simple majority vote of the members present at a meeting of the Committee. Such meetings ordinarily will involve personal attendance; however, the determination to provide advice and recommendations may also be reached through telephonic meetings of the members participating in such a meeting.

Section 3.

The Advisory Committee will have the ability to establish subcommittees, whose purpose will be advisory in nature, with advice and recommendations to be provided to the Advisory Committee and to the Board and to the Director of Intercollegiate Athletics.

Section 4.

The Advisory Committee will meet four (4) times during the academic year, with meetings scheduled around home athletic events, when reasonably possible. The Advisory Committee may meet at other times during the year, on the call of the Director of Intercollegiate Athletics, the Chairperson of the Advisory Committee or the Chairperson of the Board of Directors.

Section 5.

The Director of Intercollegiate Athletics will provide an annual charge to the Advisory Committee at the first meeting of a new academic year.

10

**ARTICLE X - EFFECTIVE DATE**

These Bylaws are hereby adopted by the Board on this 11th day of June, 2004, and amended on the 7th  day of February, 2013, and shall be and are fully effective as of this date but without any retroactive effect. All prior Bylaws of the Corporation are hereby repealed and superseded in their entirety by these Bylaws.

Approved:

Theresa Gordzica
Secretary/Treasurer

**RESOLUTION**

KANSAS ATHLETICS, INC.
AMENDMENT TO BYLAWS

**WHEREAS**, Kansas Athletics, Inc., a Kansas non-profit corporation (the "Corporation"), is a University of Kansas ("University") affiliated organization; and

**WHEREAS**, the Corporation's Board of Directors is comprised of seven (7) voting members, including several University administrators, as stated in Section 1.b. of the Corporation's Bylaws; and

**WHEREAS**, certain University administrators' titles have changed, which necessitates amending the Corporation's Bylaws.

**NOW, THEREFORE**, be it resolved:

Section 1.b. of the Corporation's Bylaws are amended and restated in its entirety to read as follows:

"b)      The voting members of the Board shall include the following:

i)       The Chancellor of the University of Kansas;

ii)      The University of Kansas Director of Intercollegiate Athletics;

iii)     The University of Kansas Chief Financial Officer and Vice Provost of Finance;

iv)      The University of Kansas Faculty Athletics Representative to the Big 12 Conference (or its successor), appointed by the Chancellor;

v)       One (1) Senior University Administrator (the Provost or designee) University of Kansas, Lawrence campus;

vi)      The Vice Provost for Student Affairs, University of Kansas, Lawrence campus; and

vii)     The President of the Student Body of the University of Kansas, Lawrence campus."

This Resolution shall take effect and be in full force immediately after its adoption by the Board of Directors.

\* \* \* \*

{L0065608.1 }



EXHIBIT L

I, the undersigned, Secretary/Treasurer of Kansas Athletics, Inc., hereby certify that the above and foregoing is a true and correct copy of a certain resolution adopted by the of the Board of Directors of said Corporation at a meeting of said Board of Directors duly and regularly held on the 27th day of June 2018. I further certify that said Resolution has not been modified, amended or repealed and is in full force and effect as of the date hereof.

By: _____
          Diane Goddard

Title:       Secretary/Treasurer

Date: _____

AGREEMENT BETWEEN
THE UNIVERSITY OF KANSAS
AND
THE UNIVERSITY OF KANSAS ATHLETIC CORPORATION

THIS AGREEMENT entered into this __1st__ day of __December__, 1988,
between THE UNIVERSITY OF KANSAS (hereinafter called the "University") and THE
UNIVERSITY OF KANSAS ATHLETIC CORPORATION (hereinafter called the "Corpora-
tion").

WITNESSETH:

WHEREAS, it is desirable and in the best interests of the University and
the Corporation to state in general terms their mutual responsibilities in the
development and operation of, and in the use of the University facilities for,
the University's intercollegiate athletic program;

NOW, THEREFORE, in consideration of the mutual agreements herein contain-
ed, the University and the Corporation agree as follows:

1.  In accordance with the principle of institutional control of inter-
collegiate athletics, the intercollegiate athletic program will be operated by
the Corporation as a division of the University.  Except for those policies
and procedures which are unique to the Corporation, passed by the Corpora-
tion's Board of Directors and approved by the Chancellor, the Corporation
shall be subject at all times to applicable University regulations and admini-
strative policies.

2.  The Corporation shall be entitled to the use and control of the
stadium, field house, field house annex, baseball field, tennis courts at
Allen Field House, intercollegiate athletic practice areas, and Anschutz
Pavilion, but such facilities shall be available for other University or
University approved activities and events on terms and conditions mutually
agreeable to the University and the Corporation.

EXHIBIT M

3. The University shall provide steam, electricity, and water for the field house, the field house annex, the Anschutz Sports Pavilion, and all outdoor athletic facilities covered by this agreement. The University shall also provide such routine police and fire protection as is customarily provided other campus facilities, and shall make available to the Corporation use of the CENTREX/KANS-A-N telephone system. The Corporation shall be responsible for paying for the use of the telephone system.

4. The University shall make available to the Corporation such other University facilities as may reasonably be necessary for the operation of the intercollegiate athletic program. Specifically included shall be the Robinson gymnasium pool, gymnastic area, and dressing facilities for participants in those two sports. Terms and conditions for use of these areas must be agreed upon by the University and the Corporation, such terms to be subject to the general restrictions on Corporation use of University facilities set forth in paragraph two.

5. All of the Corporation's gate receipts for intercollegiate athletic events, all donations to the Corporation, all student activity fees allocated to the Corporation, and all other income of the Corporation shall be the property of the Corporation and shall be used to defray the cost of operating, improving and maintaining the intercollegiate athletic program of the University and to defray the cost of operating, and of constructing, improving and maintaining facilities for the intercollegiate athletic program. Any and all donations shall be deposited in special accounts with the University of Kansas Endowment Association and may be drawn upon for expenditures of the Corporation. The books and records of the Corporation shall be public records and shall be annually audited by an independent certified public accountant, and the audit report shall be furnished to the Board of Regents and filed with the

-2-

state agency in charge of post auditing state expenditures.

6.  With the prior approval of the Chancellor, the Corporation may borrow money for the construction or improvement of facilities or for the purchase of equipment or for operational expenses.

7.  This agreement is effective December 1, 1988, and shall automatically and without further action on the part of either party be extended from year-to-year, unless and until one of the parties shall give to the other party written notice prior to January 1 of a given year to be effective the following June 30.  This agreement shall immediately terminate in the event that the Corporation shall be dissolved either by mutual agreement of both parties or by order of the Chancellor, the Board of Regents, the Big Eight Conference or the National Collegiate Athletic Association, or under the command of the laws of the State of Kansas.  This agreement may be reviewed at any appropriate time by written request of either party to the agreement for the purpose of effecting such revision as may be necessitated by changing conditions, changed laws or regulations.

IN WITNESS WHEREOF, the undersigned have caused this agreement to be executed as of the day and year first above written.

THE UNIVERSITY OF KANSAS,

By: _____
    Chancellor

THE UNIVERSITY OF KANSAS ATHLETIC
CORPORATION

By: _____
    Chairman, KUAC Board

-3-

AMENDMENT TO AGREEMENT BETWEEN
THE UNIVERSITY OF KANSAS
AND
THE UNIVERSITY OF KANSAS ATHLETIC CORPORATION

This Amendment is entered into this 1st day of October, 1995, between the University of Kansas (hereinafter "University") and the University of Kansas Athletic Corporation (hereinafter "Corporation") to amend the agreement entered December 1, 1988, between the University and the Corporation.

In consideration of the mutual agreements herein contained, the University and the Corporation agree to the following:

1. Section 2 of the Agreement is amended as follows: "The Corporation shall be entitled to the use and control of Memorial Stadium, Allen Field House, Allen Field House Annex, Parrott Athletic Center, Shaffer-Holland Strength Center, the baseball field, the tennis courts at Allen Field House, the intercollegiate athletic practice areas, and Anschutz Sports Pavilion, but such facilities shall be available for other University or University-approved activities and events on terms and conditions mutually agreeable to the University and the Corporation. When the foregoing facilities are under the use and control of the Corporation, the Corporation shall be responsible for such use and control and for any claims arising out of the Corporation's use and control of the facilities. To that end, the Corporation shall list the State of Kansas, the Board of Regents of the State of Kansas, University of Kansas and their agents and employees as additional insureds on the Corporation's liability insurance policies. When the foregoing facilities are used and controlled by the University, it is agreed that claims arising out of this use and control shall be subject to the provisions of the Kansas Tort Claims Act, K.S.A. 75-6101 et seq. and that the Corporation's responsibilities shall be limited to any act or omission of the Corporation or its agents and employees."

EXHIBIT N

-2-

2. Section 3 of the Agreement is amended as follows: "The University shall provide steam, electricity, and water for the field house, the field house annex, the Anschutz Sports Pavilion, and all outdoor athletic facilities covered by this agreement. The University shall also provide such routine police and fire protection as is customarily provided other campus facilities, and shall make available to the Corporation use of the University telecommunications system. The Corporation shall be responsible for paying for the use of the telephone system."

3. Section 4 of the Agreement is amended as follows: "The University shall make available to the Corporation such other University facilities as may reasonably be necessary for the operation of the intercollegiate athletic program. Specifically included shall be the Robinson Center Swimming and Diving Pools, volleyball courts, gymnastics area, and dressing facilities for participants in those two sports. Terms and conditions for use of these areas must be agreed upon by the University and the Corporation, such terms to be subject to the general restrictions on Corporation's use of University facilities set forth in paragraph two."

4. All other provisions of the agreement remain in effect.

IN WITNESS WHEREOF, the undersigned have caused this Amendment to Agreement to be executed as of the day and year first written above.

THE UNIVERSITY OF KANSAS

By: _____
Robert E. Hemenway, Chancellor

THE UNIVERSITY OF KANSAS
ATHLETIC CORPORATION

By: _____
Chair of the KUAC Board

g:\wp\bkm\agreemen\ku-kuac.amd

Copy _4_ of 4 copies

## SECOND AMENDMENT
## BY AND BETWEEN
## THE UNIVERSITY OF KANSAS
## AND
## KANSAS ATHLETICS, INCORPORATED

**This SECOND AMENDMENT**, effective as of July 1, 2007 (the "Second Amendment"), by and between the University of Kansas (the "University") and Kansas Athletics, Incorporated, formerly "the University of Kansas Athletic Corporation," (the "Corporation"), amends the Agreement Between the University of Kansas and the University of Kansas Athletic Corporation, dated December 1, 1988, as previously amended by the Amendment to Agreement Between the University of Kansas and the University of Kansas Athletic Corporation, dated October 1, 1995, and as previously supplemented by the Supplemental Agreement Between the University of Kansas and the University of Kansas Athletic Corporation, dated January 15, 1998, and as previously supplemented by the Second Supplemental Agreement Between the University of Kansas and the University of Kansas Athletic Corporation, effective December 1, 2004 (collectively, the "Operating Agreement").

**WHEREAS**, the University desires that the Corporation pay all utility expenses of the Corporation; and,

**WHEREAS**, the Corporation desires that the University incur the costs of any staff and faculty ticket discounts to certain athletics events conducted by the Corporation.

**NOW, THEREFORE**, in consideration of the mutual agreement herein contained, the University and the Corporation agree as follows:

1. Effective July 1, 2007, the Corporation shall pay all utility costs for all its indoor and outdoor operations at the University, including but not limited to electric, gas, trash, water, steam, and sewer expenses, excepting only those utilities associated with the Corporation's use of any facilities in the Robinson Center and the Student Recreation Facility.

2. Effective for ticket sales for sport seasons after July 1, 2007, the University shall assume payment of all University staff and faculty season ticket discounts offered by the Corporation, up to, but not to exceed, 20 percent of the face value of the tickets. The University shall pay the discount for a maximum of two season tickets per sport per staff or faculty member. The University and the Corporation will mutually agree on the amount of the discount.

3. Except as amended hereby, all other provisions of the Operating Agreement shall remain in full force and effect.

{L0010324 / 3}

EXHIBIT O

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement to be effective on the day and year first above written.

**THE UNIVERSITY OF KANSAS**

By: _____

Robert E. Hemenway, Chancellor

**KANSAS ATHLETICS, INCORPORATED**

By: _____

Lew Perkins, Chair

# THIRD AMENDMENT
# BY AND BETWEEN
# THE UNIVERSITY OF KANSAS
# AND
# KANSAS ATHLETICS, INCORPORATED

**This THIRD AMENDMENT**, effective as of July 1, 2010 (the "Third Amendment"), by and between the University of Kansas (the "University") and Kansas Athletics, Incorporated, formerly "the University of Kansas Athletic Corporation," (the "Corporation"), amends the Agreement Between the University of Kansas and the University of Kansas Athletic Corporation, dated December 1, 1988, as previously amended by the Amendment to Agreement Between the University of Kansas and the University of Kansas Athletic Corporation, dated October 1, 1995, the Second Amendment by and Between the University of Kansas and Kansas Athletics, Incorporated, dated July 1, 2007, and as previously supplemented by the Supplemental Agreement dated January 15, 1998, the Second Supplemental Agreement, dated December 1, 2004, and the Third Supplemental Agreement, dated July 1, 2008 (collectively, the "Operating Agreement").

**WHEREAS,** the University desires to clarify the Corporation's role in the negotiation of agreements and receipt of revenue from media, apparel, and concession rights; and

**WHEREAS,** the University desires that Corporation monitor and oversee the Trademark Licensing program which monitors the University's trademark/servicemark program; and

**WHEREAS,** the Corporation desires to clarify the obligations and expectations of the University in regard to the above.

**NOW, THEREFORE,** in consideration of the mutual agreement herein contained, the University and Corporation agree as follows:

1.      The Corporation shall operate the University's trademark licensing program pursuant to the Trademark Licensing Agreement between the University of Kansas and Kansas Athletics, Inc., effective November 1, 2005, and as amended thereafter.

2.      The Corporation shall enter into agreements for apparel and media rights for the benefit of the intercollegiate athletics program.  The Corporation shall have the exclusive right to sell concessions, including but not limited to beverages, at intercollegiate athletic events held on the Lawrence campus.  Except as otherwise agreed between the parties, Corporation revenue generated from these agreements and arrangements shall be the property of the Corporation and shall be used to defray the cost

1

EXHIBIT P

of operating, improving, and maintaining the intercollegiate athletics program of the University.

      3.      All other provisions of the Operating Agreement shall remain in full force and effect.

      **IN WITNESS WHEREOF,** the parties hereto have executed this Agreement to be effective on the day and year first above written.

**THE UNIVERSITY OF KANSAS**

By: _Bernadette Gray-Little_
Bernadette Gray-Little
Chancellor

**KANSAS ATHLETICS, INCORPORATED**

By: _____ 11/26/10
Sean Lester
Interim Director of Athletics

2

# Kansas Athletics, Incorporated and Subsidiary

Independent Auditor's Report and Consolidated Financial Statements

June 30, 2018 and 2017



EXHIBIT Q

# Kansas Athletics, Incorporated and Subsidiary
## June 30, 2018 and 2017

## Contents

**Independent Auditor's Report**.................................................................................................. 1

**Consolidated Financial Statements**

Statements of Financial Position ........................................................................................... 3

Statements of Activities.......................................................................................................... 4

Statement of Functional Expenses........................................................................................ 6

Statements of Cash Flows ..................................................................................................... 7

Notes to Financial Statements .............................................................................................. 8



1201 Walnut Street, Suite 1700 | Kansas City, MO 64106-2246
816.221.6300 | Fax 816.221.6380 | bkd.com

# Independent Auditor's Report

Board of Directors, Audit Committee
  and Management
Kansas Athletics, Incorporated and Subsidiary
Lawrence, Kansas

We have audited the accompanying consolidated financial statements of Kansas Athletics, Incorporated and Subsidiary (the Corporation), which comprise the consolidated statements of financial position as of June 30, 2018 and 2017, and the related consolidated statements of activities and cash flows for the years then ended and the consolidated statement of functional expenses for the year ended June 30, 2018, and the related notes to the consolidated financial statements.

## *Management's Responsibility for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

## *Auditor's Responsibility*

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements.  The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error.  In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control.  Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.



Board of Directors, Audit Committee
  and Management
Kansas Athletics, Incorporated and Subsidiary
Page 2

*Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Kansas Athletics, Incorporated and Subsidiary as of June 30, 2018 and 2017, and the changes in its net assets and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

*Emphasis of Matters*

As described in Note 14 to the consolidated financial statements, in 2018, the Corporation adopted ASU 2016-14, *Not-for-Profit Entities* (Topic 958): *Presentation of Financial Statements of Not-for-Profit Entities*.  In addition, as described in Note 15, the 2017 consolidated financial statements were restated to appropriately account for the net asset restrictions relating to certain contributions receivable.  Our opinion is not modified with respect to these matters.

*BKD, LLP*

Kansas City, Missouri
September 17, 2018

# Kansas Athletics, Incorporated and Subsidiary
## Consolidated Statements of Financial Position
## June 30, 2018 and 2017

|  | 2018 | 2017 (As Restated) |
|---|---|---|
| **Assets** | | |
| Cash | $ 9,428,409 | $ 8,042,438 |
| Tickets and accounts receivable, net of allowance; | | |
| 2018 - $231,229; 2017 - $85,813 | 7,228,247 | 3,890,314 |
| Contributions receivable, net of allowance; | | |
| 2018 - $782,912; 2017 - $733,983 | 66,631,723 | 19,007,321 |
| Investments | 54,418,923 | 52,183,096 |
| Other assets | 2,986,666 | 1,728,199 |
| Property and equipment, net of accumulated depreciation; | | |
| 2018 - $92,449,463; 2017 - $83,179,637 | 92,201,946 | 94,630,677 |
| Total assets | $ 232,895,914 | $ 179,482,045 |
| **Liabilities and Net Assets** | | |
| **Liabilities** | | |
| Accounts payable | $ 9,116,086 | $ 4,165,343 |
| Accrued expenses | 5,307,527 | 8,289,414 |
| Advance ticket sales | 9,868,625 | 10,209,308 |
| Deferred revenue | 2,515,060 | 3,027,861 |
| Long-term debt | 35,602,922 | 36,012,216 |
| Other liabilities | 2,338,172 | 2,765,265 |
| Total liabilities | 64,748,392 | 64,469,407 |
| **Net Assets** | | |
| Without donor restrictions | 58,300,865 | 63,744,629 |
| With donor restrictions | 109,846,657 | 51,268,009 |
| Total net assets | 168,147,522 | 115,012,638 |
| Total liabilities and net assets | $ 232,895,914 | $ 179,482,045 |

# Kansas Athletics, Incorporated and Subsidiary
## Consolidated Statement of Activities
### Year Ended June 30, 2018

| | Without Donor Restrictions | With Donor Restrictions | Total |
|---|---|---|---|
| **Operating Revenues, Gains and Other Support** | | | |
| NCAA and conference distributions | $ 32,695,636 | $ - | $ 32,695,636 |
| Contributions and grants | 21,521,989 | 6,027,862 | 27,549,851 |
| Ticket sales and handling fees | 20,581,056 | | 20,581,056 |
| Sponsorship and royalties | 16,513,684 | | 16,513,684 |
| Direct institutional support | 1,502,799 | | 1,502,799 |
| Realized investment income | 110,721 | 1,485,592 | 1,596,313 |
| Other operating revenue | 3,971,849 | | 3,971,849 |
| Net assets released from restrictions for operations | 6,343,938 | (6,343,938) | - |
| Total operating revenues, gains and other support | 103,241,672 | 1,169,516 | 104,411,188 |
| | | | |
| **Operating Expenses** | | | |
| Salaries and benefits | 40,825,687 | | 40,825,687 |
| Grants-in-aid | 14,891,635 | | 14,891,635 |
| Team travel | 6,952,129 | | 6,952,129 |
| Team operating expense | 8,487,822 | | 8,487,822 |
| Student athlete training and development | 2,042,087 | | 2,042,087 |
| Game operating expenses | 2,882,681 | | 2,882,681 |
| Guarantees paid to visiting teams | 1,556,968 | | 1,556,968 |
| Facilities and equipment | 5,032,894 | | 5,032,894 |
| General administration and other | 16,803,643 | | 16,803,643 |
| Depreciation and amortization | 5,375,033 | | 5,375,033 |
| Total operating expenses | 104,850,579 | - | 104,850,579 |
| | | | |
| **Operating Income (Loss)** | (1,608,907) | 1,169,516 | (439,391) |
| | | | |
| **Other Income (Expense)** | | | |
| Contributions restricted for capital projects | | 58,649,291 | 58,649,291 |
| Unrealized investment income | 68,014 | 1,291,172 | 1,359,186 |
| Interest expense | (1,379,691) | | (1,379,691) |
| Depreciation on donor-funded property and equipment | (3,942,795) | | (3,942,795) |
| Net loss from Jayhawk Tennis Center | (323,812) | | (323,812) |
| Bad debt expense on contributions restricted for capital projects | | (303,409) | (303,409) |
| Transfer of assets to the University | (484,495) | | (484,495) |
| Net assets released from restrictions for capital projects | 2,227,922 | (2,227,922) | - |
| Other income (expense) | (3,834,857) | 57,409,132 | 53,574,275 |
| | | | |
| **Change in Net Assets** | (5,443,764) | 58,578,648 | 53,134,884 |
| | | | |
| **Net Assets, Beginning of Year** | 63,744,629 | 51,268,009 | 115,012,638 |
| | | | |
| **Net Assets, End of Year** | $ 58,300,865 | $ 109,846,657 | $ 168,147,522 |



# KANSAS BOARD OF REGENTS
# POLICY MANUAL

**NOTE:**   The policies codified herein are subject to change by formal action of the Board of Regents.  Whenever there is a conflict between the provisions of this manual and the official minutes of the Board of Regents, the official minutes will control.

EXHIBIT R

# TABLE OF CONTENTS

**CHAPTER I: BOARD OF REGENTS MEMBERS, OPERATIONS AND STAFF**

**A   BOARD MEMBERS AND BOARD OPERATIONS**

1   BOARD MEMBERS ................................................................................................................ 1
(a. Selection and Qualifications, b. Term of Office, c. Compensation and Expenses,
d. Conflict of Interest Identification and Management)

2   SOURCE OF LEGAL AUTHORITY ..................................................................................... 3

3   BASIC PRINCIPLES AND OPERATING PROCEDURES .................................................. 3
(a. Principles – i. Coordination, ii. Governance, iv. Regulation; b. Procedures – i. Councils,
ii. Involvement & Participation, iii. Development of Proposals, iv. Role of the President
and Chief Executive Officer, v. Timeliness of Review & Action)

4   COUNCILS AND COMMITTEES ......................................................................................... 6

5   COMMUNICATIONS WITH THE BOARD ....................................................................... 10

6   BOARD MEETING AGENDA ITEMS ............................................................................... 11

7   PROCEDURES FOR PUBLIC COMMENT ........................................................................ 11

8   RECORD OF BOARD ACTIONS ....................................................................................... 11

**B   BOARD OFFICE AND OFFICE OPERATIONS**

1   BOARD PRESIDENT AND CHIEF EXECUTIVE OFFICER ............................................ 12

2   BOARD OFFICE STAFF ..................................................................................................... 13
(a. Organization Chart, b. Supplemental Staff, c. Leave, d. Retirement & Insurance Benefits,
e. Commitment of Time, Conflict of Interest, Consulting & Other Employment,
f. Out-of-State Travel Requests, g. Criminal Background Checks)

3   CONTRACTS ....................................................................................................................... 15

4   PROCEDURES RELATING TO REQUESTS FOR INSPECTION OF
PUBLIC RECORDS AND OBTAINING COPIES .............................................................. 15

**CHAPTER II: GOVERNANCE – STATE UNIVERSITIES**

**A   ACADEMIC AFFAIRS** (see Chapter III., Section A. for additional academic affairs policies applicable to state
universities)

1   ACADEMIC CALENDAR ................................................................................................... 16

2   COURSE NUMBERING SYSTEM ..................................................................................... 16

3   CREDIT BY EXAMINATION ............................................................................................. 17

Table of Contents

4    CREDIT FOR COURSES INVOLVING TRAVEL ................................................ 17

5    PROGRAM REVIEW ................................................................................................ 17

6    PROGRAM PARTICIPATION – OUTSIDE FUNDING ..................................... 18

7    NEW ACADEMIC UNITS AND ACADEMIC PROGRAMS .............................. 18

8    INTELLECTUAL PROPERTY ............................................................................... 27
(a. General Copyright, b. Patent & Copyrightable Software, c. Trademark, d. Institutional Procedures)

9    NAMING OF ACADEMIC UNITS ......................................................................... 30

10   ACADEMIC ADVISING ......................................................................................... 30

11   UNIVERSITY PRESS OF KANSAS ...................................................................... 31

**B   STUDENTS**

1    ADMISSION ............................................................................................................. 32
(a. Undergraduate Students to State Universities, b. Undergraduate Special Programs & Graduate Programs, c. Auditing Courses)

2    INDIVIDUAL PLANS FOR STUDENT SUCCESS ............................................ 32

3    STUDENT RECORDS ............................................................................................. 33

4    STUDENT HOUSING ............................................................................................. 33

5    STUDENT HEALTH INSURANCE ....................................................................... 33

6    STUDENT RESIDENCY, TUITION/FEES, AND PAYMENTS ......................... 34
(a. Residence Classification for Fee Purposes, b. Appeals, c. Residence Committee, d. Decisions of Residence Committee, e. Guidelines)

7    STUDENT LOANS ................................................................................................... 35

8    ON-CAMPUS CREDIT CARD SOLICITATION ................................................. 35

9    STUDENT ORGANIZATIONS AND ACTIVITIES ........................................... 36

10   STUDENT ACADEMIC DISHONESTY .............................................................. 36

11   STUDENT COMPLAINT PROCESS .................................................................... 36

Table of Contents

## C   CHIEF EXECUTIVE OFFICER, FACULTY AND STAFF

1   ADMINISTRATIVE ORGANIZATION ............................................................. 38

2   APPOINTMENTS ............................................................................................ 38
(a. Chief Executive Officer – i. General Provisions, ii. Compensation, iii. Appointment Process,
iv. Assessment; b. Faculty and Staff – i. General Provisions, ii. Recruiting, iii. Spoken English Language
Competency, iv. Criminal Background Checks, v. Nepotism, vi. Annual & Multiple Year
Appointments, vii. Tenure for Tenure-Track Faculty Appointments)

3   PROFESSORSHIPS ......................................................................................... 48
(a. Regents Distinguished Professorships, b. Regents Distinguished Research Scholar,
c. The Kansas Partnership for Faculty of Distinction Program)

4   PROMOTIONS IN ACADEMIC RANK .......................................................... 50

5   FINANCIAL EXIGENCY .................................................................................. 51

6   SUSPENSIONS, TERMINATIONS AND DISMISSALS .................................. 51

7   NOTICE PROCEDURE FOR NON-REAPPOINTMENT ................................. 52

8   EVALUATION OF FACULTY AND POST-TENURE REVIEW ...................... 52

9   FACULTY OF THE YEAR AWARD ................................................................ 53

10   LEAVE ............................................................................................................ 53

11   HEALTH PROGRAM AND OTHER INSURANCE ......................................... 58

12   COMMITMENT OF TIME, CONFLICT OF INTEREST, CONSULTING AND
OTHER EMPLOYMENT ................................................................................. 58
(a. General Principles, b. Consulting for Other State of Kansas Agencies, c. Reporting
Requirements, d. Use of University Name, e. Campus Policy Development & Enforcement,
f. Distribution & Dissemination)

13   POLITICAL ACTIVITY .................................................................................. 62

14   RETIREMENT ................................................................................................ 62
(a. Retirement Benefits, b. Phased Retirement Program, c. Limited Retirement Health
Care Bridge)

15   EMERITUS/EMERITA STATUS ..................................................................... 63
(a. Chief Executive Officers, b. Faculty & Other Administrative Officers)

16   HONORARIA ................................................................................................... 63

17   WITHHOLDING OF PAYCHECKS AND SET-OFF OF AMOUNTS OWED ................. 63

18   KANSAS TORT CLAIMS ACT/LEGAL DEFENSE OF EMPLOYEES ........................ 63

19   WHISTLEBLOWING ....................................................................................... 64

Table of Contents

20   REPORTING OF CHILD SEXUAL ABUSE ........................................................... 64

**D   FISCAL MANAGEMENT AND BUSINESS ADMINISTRATION** (see Chapter III., Section B. for additional fiscal management policies applicable to state universities)

1   TUITION AND FEES ....................................................................................... 65
(a. Institutional Procedures, b. Establishment or Alteration of Fees & Tuition Rates, c. Calendar for Fee & Tuition Rate Adjustments, d. Payment & Fees, e. Collection of Overdue Accounts, f. Write-Off of Uncollectible Accounts Receivable, g. Tuition Assistance for Faculty/Staff, h. Board Approval of Tuition & Fee Waivers Pursuant to K.S.A. 76-719c)

2   STATE APPROPRIATIONS ............................................................................. 66
(a. Unified State Appropriation Request, b. State University Annual Operating Budgets)

3   FEDERAL FUNDS ........................................................................................... 67

4   ACCEPTANCE OF GIFTS ............................................................................... 67

5   CROWDFUNDING .......................................................................................... 68

6   FINANCIAL REPORTING ............................................................................... 68
(a. Annual Financial Report, b. Internal Audit Function, c. Non-Public Funds Management Review)

7   DESIGNATION OF CHIEF FINANCIAL OFFICER ........................................ 70

8   AFFILIATED CORPORATIONS ...................................................................... 70

9   AUXILIARY ENTERPRISES .......................................................................... 70

10   SALES OF PRODUCTS AND SERVICES ...................................................... 71
(a. Sales of Products & Services to Students, Faculty, Staff, & University Guests, b. Sales to the External Community, c. Compliance, d. Competition Grievance Procedure)

11   SERVICE CLEARING ACTIVITIES ............................................................... 74

12   CONTRACTS ................................................................................................. 74

13   CAPITAL FINANCING ................................................................................... 75

14   PURCHASING PURSUANT TO K.S.A. 76-769 ............................................. 78

15   PURCHASING INSURANCE .......................................................................... 79

16   ADVERTISING .............................................................................................. 79

17   AUTHORIZED DISPOSITION OF SURPLUS PROPERTY ........................... 79

18   REFUND FROM FEE AGENCY ACCOUNTS ................................................ 80

19   SPONSORED RESEARCH OVERHEAD ........................................................ 80

Table of Contents

20   THE KANSAS PARTNERSHIP FOR FACULTY OF DISTINCTION PROGRAM ......................... 80

21   VEHICLES AND EQUIPMENT ................................................................................................. 82

22   TRAVEL ................................................................................................................................... 82
     (a. Out-of-State Travel Requests – Faculty & Staff, b. Out-of-State Travel Requests –
     Chief Executive Officers)

**E     FACILITIES**

1    PROJECT PLANNING ............................................................................................................... 83
     (Campus Master Plans)

2    SUMMARY OF PROJECT APPROVAL REQUIREMENTS ................................................... 83

3    CAPITAL IMPROVEMENT PROJECTS ................................................................................. 84
     (a. Definitions, b. Process, c. Funding, d. Annual Maintenance)

4    REHABILITATION AND REPAIR PROJECTS ....................................................................... 86
     (a. Definitions, b. Process, c. Funding)

5    2007 STATE EDUCATIONAL INSTITUTION LONG-TERM INFRASTRUCTURE
     MAINTENANCE PROGRAM ................................................................................................... 86
     (a. Definitions, b. Process, c. Funding)

6    ENERGY CONSERVATION MEASURES (K.S.A. 75-37,125) ................................................. 88

7    OBSOLETE BUILDINGS .......................................................................................................... 88

8    INSPECTIONS ........................................................................................................................... 88
     (a. State Fire Marshal, b. Department of Administration, c. Boiler & Other Inspections
     Required by Law)

9    PRIVATE HOUSING ................................................................................................................. 89

10   REPORTS DUE .......................................................................................................................... 89

11   LAND TRANSACTIONS ........................................................................................................... 89
     (a. Leases, b. Easements, c. Sale of Real Property, d. Acquisition of Real Property, e. Real
     Property Transactions with State University Endowments, Foundations & Other Related
     Organizations, f. Designation on the State or National Historic Register)

12   NAMING OF BUILDINGS.......................................................................................................... 92
     (a. Authority for Naming, b. Criteria, c. Process)

13   PARKING AND TRAFFIC RULES ........................................................................................... 93

14   WEAPONS POSSESSION .......................................................................................................... 93

15   USE OF CAMPUS FACILITIES ............................................................................................... 95

Table of Contents

16    SERVICE OF ALCOHOL IN NON-CLASSROOM AREAS ................................. 96

17    CEREAL MALT BEVERAGES ............................................................. 96

**F    OTHER**

1    INTERACTION WITH LEGISLATURE, COURTS, AND OTHER STATE AGENCIES ................. 97
     (a. Legislative Appearances & Committee Hearings, b. Legislative Requests & Proposed
     Legislation, c. Legislative Post Audit Reports, d. Information Requests from Other State
     Agencies, e. Attorney General Opinions, f. Kansas Governmental Ethics Commission
     Opinions, g. State and Federal Court Actions)

2    INTERFERENCE WITH CONDUCT OF INSTITUTION ...................................... 98

3    STATEMENT ON DIVERSITY AND MULTICULTURALISM ................................. 98

4    AFFIRMATIVE ACTION, EQUAL OPPORTUNITY AND TITLE IX SEX
     DISCRIMINATION ................................................................... 98

5    RACIAL, SEXUAL AND OTHER UNLAWFUL HARASSMENT ................................ 99

6    USE OF SOCIAL MEDIA BY FACULTY AND STAFF .................................... 99

7    USE OF CONTROVERSIAL MATERIAL, INCLUDING THE USE OF SEXUALLY
     EXPLICIT MATERIALS, IN INSTRUCTION ........................................... 100

8    SUSTAINABILITY AND IMPLEMENTATION PRINCIPLES ................................ 101

**CHAPTER III: COORDINATION – STATE UNIVERSITIES, COMMUNITY COLLEGES, TECHNICAL
COLLEGES, WASHBURN UNIVERSITY AND/OR THE WASHBURN INSTITUTE OF TECHNOLOGY**

**A    ACADEMIC AFFAIRS** (See Chapter II. Section A. for additional academic affairs policies applicable to state
universities)

1    PERFORMANCE AGREEMENTS ....................................................... 103

2    TRANSFER AND ARTICULATION .................................................... 103

3    REVERSE TRANSFER AGREEMENTS ................................................. 107

4    CREDIT FOR PRIOR LEARNING .................................................... 108

5    APPROVAL OF PROGRAMS FOR COMMUNITY COLLEGES, TECHNICAL
     COLLEGES AND WASHBURN INSTITUTE OF TECHNOLOGY ............................. 108

6    APPROVAL OF CREDIT COURSES FOR COMMUNITY COLLEGES, TECHNICAL
     COLLEGES AND WASHBURN INSTITUTE OF TECHNOLOGY ............................. 111

7    APPROVAL OF PROGRAMS FOR WASHBURN UNIVERSITY ............................. 112

Table of Contents

8    OFF-CAMPUS DELIVERY OF ACADEMIC COURSES AND PROGRAMS.............................. 112
     (a. General Provisions, b. Definitions, c. Administration of Requests for Off-Campus Face-
     to-Face Academic Courses or Programs to be Delivered Outside Assigned Service Area,
     d. Maintenance of Quality, e. State Universities & Washburn University, f. Community Colleges,
     Technical Colleges & Washburn Institute of Technology, g. Appeal Process)

9    DEGREES.................................................................................................................... 122

10   DEFINITION OF CERTIFICATE FOR COMMUNITY COLLEGES AND
     TECHNICAL COLLEGES............................................................................................ 126

11   COLLABORATIVE PROGRAM/DEGREE.................................................................... 126

12   ACCREDITATION OF DEGREE GRANTING INSTITUTIONS .................................. 128

13   CONCURRENT ENROLLMENT OF HIGH SCHOOL STUDENTS IN ELIGIBLE
     PUBLIC POSTSECONDARY INSTITUTIONS THROUGH CONCURRENT
     ENROLLMENT PARTNERSHIPS ............................................................................... 128

14   DEVELOPMENTAL EDUCATION ............................................................................. 132

15   PRINCIPLES AND GUIDELINES FOR INSTITUTIONAL AFFILIATIONS WITH
     STATE UNIVERSITIES............................................................................................... 132

16   PARTICIPATION IN MIDWEST STUDENT EXCHANGE PROGRAM FOR
     STATE UNIVERSITIES, COMMUNITY COLLEGES, TECHNICAL COLLEGES
     AND WASHBURN UNIVERSITY ............................................................................... 134

B    FISCAL MANAGEMENT (see Chapter II., Section B. for additional fiscal management policies applicable to
     state universities)

1    UNIFIED STATE APPROPRIATION REQUEST .......................................................... 135

2    KANSAS TECHNOLOGY INNOVATION AND INTERNSHIP GRANT ...................... 135
     (a. Background, b. Participation, c. Conditions for Participation/Application Guidelines,
     d. Allowable Expenditures, e. Transfer & Expenditure of Funds, f. Reporting Requirements,
     h. Application Timeframe, i. Allocation of Funds for Grants)

Chapter II: Governance – State Universities

C    CHIEF EXECUTIVE OFFICER, FACULTY AND STAFF

Unless otherwise specifically stated, as used in the following provisions, the term "unclassified staff" does not include those positions that have been converted from classified to unclassified pursuant to K.S.A. 2011 Supp. 76-715a, and amendments thereto (i.e. University Support Staff). The words "benefits-eligible" and "full-time" as used herein shall not include positions or employees who are deemed to be full-time exclusively by virtue of the state of Kansas Health Care Commission's determination of eligibility for purposes of employer-provided healthcare coverage. The terms "spouse" and "family" shall be defined in accordance with applicable United States Supreme Court holdings.

1    ADMINISTRATIVE ORGANIZATION

Major reorganization of a state university's administrative structure, as well as the creation of academic divisions, departments, or colleges, must have the approval of the Board.

2    APPOINTMENTS

a    Chief Executive Officer

i    General Provisions

(1)    Subject to the policies, rules and regulations of the Board of Regents, the chief executive officer of each state university shall administer the affairs of the university. The Board of Regents holds the chief executive officer responsible and accountable for all operations of the university, including university controlled affiliated corporations, and expects that each chief executive officer shall devote his or her undivided attention and energies to management of the university.

(2)    The chief executive officer of each state university serves at the pleasure of the Board. The selection of the chief executive officer of each state university shall be made by the Board. The chief executive officer of each state university shall be required to live in the official residence if provided.

(3)    The Board shall determine and approve the compensation to be received from any source by each chief executive officer for duties and responsibilities performed as chief executive officer, or reasonably related thereto.

(4)    No chief executive officer shall accept an appointment to the board of directors of any corporation or organization, which pays for such services, without the advance approval of the Chair of the Board of Regents. The chief executive officer shall provide such information about the appointment as requested by or on behalf of the Board.

(5)    No later than April 30 of each year, each chief executive officer shall submit a written report to the President and Chief Executive Officer of the Board providing information on all income received by the chief executive officer from any source other than his or her state university for the immediately preceding calendar year. Such report shall include date, location and description of services rendered and the amount of remuneration received. The report shall also include all funds provided by an affiliated corporation to the chief executive officer for use at his or her discretion. The report shall be maintained in the personnel file of the chief executive officer.

(6)    The Board may pay, or authorize payment of, the actual and necessary travel expenses for a candidate interviewing for the position of chief executive officer of a state university or President and Chief Executive Officer of the Board. (K.S.A. 76-727)

(7)    The Board may reimburse, or authorize reimbursement of, an applicant for the position of chief executive officer or President and Chief Executive Officer for all or part of the applicant's moving expenses from the applicant's out-of-state residence to the place of residence in Kansas. (K.S.A. 76-727)

ii    Compensation

(1)    Policy Statement

(1)   "non-public funds" means any funds expended for the benefit of the state university but not processed through the state financial system, and

(2)   "affiliated corporation" shall not include the Wichita State University Board of Trustees.

7   DESIGNATION OF CHIEF FINANCIAL OFFICER

Each state university chief executive officer shall appoint or designate a chief financial officer for the university.  Each chief financial officer shall report directly to the university chief executive officer and shall be endowed with authority to effectively perform the standard duties and responsibilities of a chief financial officer, including having a broad knowledge and understanding of all of the institution's financial and business matters.

8   AFFILIATED CORPORATIONS

a   Affiliated corporations are incorporated entities, whether controlled or non-controlled by the university, that are funded solely or primarily by monies other than state funds and the purpose of which is to enhance or support the mission and activities of a state university.  Affiliated corporations include, but are not limited to, alumni associations, incorporated student unions, endowment associations or foundations, and athletic corporations.

i   University controlled affiliated corporations are affiliated corporations meeting one of the following criteria:

(1)   A majority of a quorum of the board of directors, or other committee charged with making decisions on behalf of the corporation, are university personnel or appointed by the state university chief executive officer, or

(2)   The corporation is otherwise controlled by the university or the university chief executive officer, as determined by the following considerations.

(a)   Does the university chief executive officer appoint voting members to the corporation's organizational committee (i.e. executive committee, finance committee, audit committee, etc.)?

(b)   Does the university chief executive officer designate, appoint or hire the corporation's executive director/chief executive officer?

(c)   To what extent does the university chief executive officer have control over the management of the corporation's day to day operations as well as control of its major decision making processes?

(d)   To what extent are public funds used to fulfill the corporation's responsibilities and mission?

ii   University non-controlled affiliated corporations are affiliated corporations that do not meet one or more of the above-listed criteria

b   State universities shall not utilize state funds for the operation of non-controlled affiliated corporations.  This provision shall not be interpreted to include reasonable fee-for-services arrangements.

9   AUXILIARY ENTERPRISES

a   Auxiliary enterprises are self-supporting state university-operated enterprises, which include, but are not limited to, student housing, student health services, unincorporated student unions, and parking.

b   The operation of auxiliary enterprises on campus is authorized when such business is related to the educational objectives of the university.  Before commencing operation of an auxiliary enterprise, the university shall first submit the proposed plan for the financing, operation and management of the auxiliary enterprise to the Board for approval. State funds shall not be used to subsidize the operation of any organization operated as an auxiliary enterprise unless specified by bond covenants or by Board action.

Board of Regents that a conscientious and good faith effort will be made by both parties to resolve the complaint at the earliest possible opportunity and that appeals to the Board of Regents will be the exception.

viii  This procedure shall not negate any other policy or afford additional rights relating to the processing of claims or charges of proscribed conduct which may be made by persons directly involved with or affected by the operation and management of a state university.  This procedure is applicable only to any individual without current access to an established institutional grievance procedure.

11    SERVICE CLEARING ACTIVITIES

All service clearing activities must be consistent with Board policy on the sale of products or services.

a     Institutional Related Activities

Each state university shall develop policies and procedures for identifying appropriate institutionally related service activities including, but not limited to, telecommunications, printing services, central stores, fleet management, and duplicating and reproduction services, and provide for administrative approvals prior to providing such services.

b     Other Organizations or Classes of Individuals

i     A state university may provide services to specific organizations or classes of individuals outside the University as approved in advance by the university's chief executive officer.  Such services will ordinarily be approved only if the organization or class of individuals has made a written request for such service.

ii    Individual projects to be undertaken for approved organizations or classes of individuals shall be reviewed by each university on written application prescribed by the university.

12    CONTRACTS

a     General Provisions

i     State universities may enter into contracts to acquire products or services normally requiring the expenditure of funds, including leases of real property as described in chapter II, section E "Facilities" of this Policy Manual, with any party or parties including any agency of the United States or any state or any subdivision of any state or with any person, partnership or corporation if the purpose of such contract is related to the operation, function or mission of the state university.  (K.S.A. 76-721)  The Board's President and Chief Executive Officer must be notified in writing of any contract which requires expenditures or transfers by the state university of an amount greater than one million dollars ($1,000,000), excluding contracts directly related to a capital improvement project.

ii    All contracts between the state universities and other state agencies shall be subject to the provisions of K.S.A. 75-3711b.  (K.S.A. 76-721).

iii   Any contract with a corporation whose operations are substantially controlled by a state university shall provide that the books and records of such corporation shall be public records and shall require an annual audit by an independent certified public accountant to be furnished to the Board of Regents and filed with the state agency in charge of post auditing state expenditures.

iv    Only the chief executive officer of the state university, or a specifically authorized designee of the chief executive officer of the state university, shall execute contracts on behalf of a state university.  All delegations of authority made pursuant to this provision shall be filed with the General Counsel of the Board of Regents at least annually.

v     All contracts shall be in the name of the state university.  Individual schools, divisions and departments shall not enter into contracts.

b     Contracts with Other State Agencies, Indirect Cost Reimbursement