**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **DAVID BEATY and DB SPORTS, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | **No. 19-2137-KHV** |
| | ) | |
| **KANSAS ATHLETICS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On March 12, 2019, David Beaty and DB Sports, LLC sued Kansas Athletics, Inc., alleging that defendant violated their written agreements when it refused to make certain payments after it terminated Beaty's employment as head football coach at the University of Kansas ("KU"). Complaint (Doc. #1). Plaintiffs bring claims for breach of contract (Count 1) and violations of the Kansas Wage Payment Act, K.S.A. § 44-313 (Count 2).[1] This matter is before the Court on Plaintiffs' Partial Motion For Summary Judgment On Their Breach Of Contract Claim (Doc. #60) filed December 20, 2019. For reasons stated below, the Court overrules plaintiffs' motion.

### Factual And Procedural Background

The following facts are uncontroverted or, where controverted, viewed in the light most favorable to defendant.

### I.    Employment Agreements

On December 5, 2014, defendant hired Beaty to be KU's head football coach. On December 8, 2014, defendant and Beaty entered a five-year employment contract ("Beaty

---

[1]    On August 8, 2019, the Court dismissed claims by DB Sports under the Kansas Wage Payment Act. Motion Hearing (Doc. #30).

Agreement"), under which Beaty agreed to "serve as head football coach for the term of this Agreement and to devote his full time and attention and give his best efforts and skill exclusively to the duties required of him as the KU head football coach." Beaty Agreement (Doc. #61-1) filed December 20, 2019 at 1. On December 1, 2016, among other changes, defendant and Beaty amended the Beaty Agreement to extend its term to December 31, 2021. Amendments To Beaty Agreement (Doc. #61-2). In connection with the Beaty Agreement, defendant also entered an agreement with DB Sports ("DB Sports Agreement"), under which DB Sports would provide defendant educational, public relations and promotional activities and services (generally "multimedia activities") that involved Beaty. DB Sports Agreement (Doc. #61-3).

Pursuant to the Beaty Agreement, Beaty's "duties and responsibilities" included "competent and diligent performance of all reasonable duties as may be required by the Head Coach in connection with the supervision and administration of the KU football program," and the "undertaking of his reasonable best efforts to comply with and assure that all persons under his supervision, including coaches and student-athletes, comply with the rules and regulations" of the National Collegiate Athletic Association ("NCAA"). Beaty Agreement (Doc. #61-1) at 1-2. In connection with the latter obligation, the agreement provided that if Beaty became aware, or had "reasonable cause to believe, that violations concerning these rules may have taken place," he had to report them the Director. Id. at 2. The agreement reiterated this duty in a section entitled "NCAA and/or Big 12 Violations," which provided that Beaty "agrees that he shall report promptly to the Director any violations known to Head Coach of governing athletics rules, including NCAA . . . by any person under the Head Coach's direct control or supervision, including but not limited to assistant coaches and student-athletes." Id. at 6.

Pursuant to the Beaty and DB Sports Agreements, if defendant terminated Beaty's employment before its term expired, Beaty and DB Sports were entitled to certain payments, depending on whether the termination was with or without cause. If defendant terminated Beaty's employment without cause, it had to pay him "a Liquidated Damages total payment of $420,000.00 payable in six equal installments," along with "all amounts due and owing under this Agreement up to the date of termination," which included installment payments over six months for a total of $2,580,000.00. Amendments To Beaty Agreement (Doc. #61-2) at 3. Similarly, the DB Sports Agreement provided that if defendant terminated Beaty's employment without cause, defendant had to pay DB Sports liquidated damages in an amount equal to 24 months of pay under the DB Sports Agreement. DB Sports Agreement (Doc. #61-3) at 2.

On the other hand, defendant could terminate Beaty's employment for cause "at any time." Beaty Agreement (Doc. #61-1) at 12. Pursuant to the Beaty Agreement, if defendant terminated Beaty's employment for cause, defendant had to pay Beaty "all amounts owing up to the date of termination only," and "[a]ll obligations of [defendant] to make further payments and/or to provide any other consideration, under this Agreement or otherwise, except to the extent already vested, shall cease immediately." Id. Similarly, under the DB Sports Agreement, if defendant terminated Beaty's employment for cause (as defined in the Beaty Agreement), defendant had to pay DB Sports "all amounts which have accrued under the [DB Sports Agreement] as of the termination date," and DB Sports "shall not be entitled to any further compensation." DB Sports Agreement (Doc. #61-3) at 2. Under the Beaty Agreement, "cause" for termination included the following:

1.   the refusal, failure . . ., fraud, or dishonesty of Head Coach in any material respect to comply with the reasonable directives of the Director or his

designee or to perform the duties set forth in Section 3 above.[2]

4.    violations by Head Coach of NCAA rules and regulations as set forth in Section 8 above.[3]

5.    failure by Head Coach to report promptly to the [Director] any violations known to Head Coach of governing athletic rules, including NCAA and/or Big 12 rules, or [defendant] or KU rules, regulations or policies by assistant coaches, student-athletes or other persons under the direct control or supervision of Head Coach.

Beaty Agreement (Doc. #61-1) at 12-13.

Pursuant to the Beaty Agreement, if defendant terminated Beaty's employment for cause, he was entitled to certain procedures. Specifically, the Beaty Agreement provided that "[p]rior to any termination for cause, [defendant] shall provide written notice to Head Coach in accordance with Exhibit A that shall specify the grounds for termination and provide Head Coach with an opportunity (not less than five (5) calendar days) to respond to any allegations against him." Id. at 13. Under Exhibit A to the Beaty Agreement, prior to termination for cause, Beaty was entitled

---

[2]    Section 3 designated Beaty's "duties and obligations," which as explained above, included "undertaking reasonable best efforts to comply with and assure that all persons under his supervision, including coaches and student-athletes, comply with the [NCAA's] rules and regulations," and his obligation to "promptly" report to the Director if he "becomes aware, or has reasonable cause to believe, that violations concerning these rules may have taken place." Beaty Agreement (Doc. #61-1) at 1-2

[3]    Section 8 was the section entitled "NCAA and/or Big 12 Violations," which as explained above, provided that "if [Beaty] is found by KU, defendant, the Big 12 Conference or the NCAA to be involved in significant, or repetitive or intentional violations (or a pattern of conduct which may constitute or lead to a major NCAA violation) of NCAA regulations, whether while employed at KU or during prior employment at another NCAA member institution, [Beaty] may be suspended without pay for a period of time and/or the employment of [Beaty] may be terminated for cause, as set forth in Section 13 below." Id. at 6. Section 8 also provided that "if [Beaty] knew or should have known of a significant or repetitive or intentional violation of NCAA regulations, and he fails to promptly report it to the Director, he agrees that he may be suspended without pay and/or terminated for cause, as set forth in Section 13 below." Id.

to written notice, an appeal and a stay on his termination during the pendency of that appeal.  Id.
at 18.

## II.     Termination And NCAA Violations

By November of 2018, defendant's CEO, Jeff Long, had decided to terminate Beaty's employment without cause.  On November 4, 2018, Long informed Beaty in a private meeting that defendant was terminating Beaty's employment without cause, and that Beaty would not be returning for the fifth, sixth and seventh seasons under the Beaty Agreement.  Because the termination was without cause, Long promised Beaty that defendant would honor its obligation to pay him $3 million.  At Long's request, Beaty agreed to finish the season as head coach.

On November 4, 2018, Long announced Beaty's termination at a press conference, at which Long explained that he had reached the decision "after a thorough and thoughtful evaluation of our football program over the last three months."  Long Press Conference (Doc. #61-7).  Long complimented Beaty's "willingness to complete the season in support of our student-athletes," and thanked Beaty for his "hard work and dedication" to the football program, which had "not resulted in the number of wins we desire[d]."  Id.  Long concluded that he knew that Beaty "will be leaving the program better than he found it."  Id.  Beaty then completed the 2018 football season as head coach.

On November 29, 2018, six days after the final game of the 2018 season, Long sent the following memorandum to Beaty:

> As discussed in my office on November 4, pursuant to Section 12 of your Employment Agreement, your Agreement with [defendant] was terminated without cause effective November 4, 2018.  All liquidated damages payments owed to you will be paid out consistent with Section 12 of your current amended Employment Agreement and Section 7 (D) of your current amended Professional Services Agreement.  I appreciate your contributions to the University of Kansas, [defendant], and Kansas Football during your time as Head Football Coach and wish you success in your future endeavors.

Long Memorandum (Doc. #61-8).

On December 13, 2018, KU General Counsel, Brian White, sent a letter to Beaty which informed him that "over the past several days," defendant had learned about "conduct and behavior" of Beaty's former subordinate, which indicated that "a possible NCAA rule violation occurred in the football program as early as December 2017." White Letter (Doc. #61-9). Moreover, the letter stated that "the information indicates that you might have knowledge of or been directly involved with the possible rule violation." Id. White stated that defendant had notified the NCAA of its initial review, and that the NCAA had agreed to allow it to conduct an investigation. White requested an "investigatory interview" with Beaty, and asked that he and his attorney contact defendant's outside counsel. Id. White explained that based on the revelations, "we will have to suspend any upcoming severance payments to you until completion of the investigation." Id. White concluded that "[o]nce the NCAA rules investigation is complete, we will evaluate the findings and determine whether your separation will be treated as a for cause or without cause separation." Id.

In January of 2019, Beaty moved to Texas to find employment, where he had spent most of his life and coaching career at various football programs. To minimize displacement, Beaty's wife and youngest daughter stayed in their house in Kansas while Beaty moved to find a new coaching job in Texas, where he had better job prospects and where his other daughter attended school. Beaty briefly resided in Rowlett, Texas before signing a lease on an apartment in Austin, Texas. He registered to vote in Texas, obtained a Texas driver's license, registered his car in Texas and updated his car insurance to reflect that he lived in Texas. On March 12, 2019, DB Sports filed an annual report with the Kansas Secretary of State, which designated Beaty as the sole member of the limited liability company and listed both of their addresses (Beaty and DB Sports)

as his house in Kansas. On this date, Beaty was still living at his residence in Austin, Texas and had been in employment discussions with various football programs in Texas.

On September 23, 2019, the NCAA issued a notice of allegations to KU regarding the alleged conduct of four current and former employees of defendant, including Beaty and Jeff Love, a former video coordinator for the football team who was later promoted to assistant coach. Specifically, the NCAA alleged that Beaty and Love each violated NCAA rules which limited the number of individuals permitted to give tactical instruction and coaching to student-athletes. For purposes of the rule, an individual is a "Countable Coach" if he or she is an "institutional staff member" who "participates (in any manner) in" providing "technical or tactical instruction related to the sport to a student-athlete at any time." NCAA Bylaws (Doc. #82-1) at 8 filed January 31, 2020. The rules specify that non-Countable Coaches are "prohibited from participating in on-court or on-field activities . . . and [are] prohibited from participating with or observing student-athletes in the staff member's sport who are engaged in nonorganized voluntary athletically related activities." Id. at 9. With respect to Love, the NCAA alleged that between December of 2017 and mid-October of 2018, the football program exceeded the limit on Countable Coaches when Love (who was then a noncoaching staff member) participated in technical and tactical instruction with football student-athletes and made or assisted in tactical decisions with football student-athletes during on-field practices.

With respect to Beaty, the NCAA alleged that from December of 2017 and mid-October of 2018, Beaty was "presumed responsible" for Love's violations, and that he did not rebut that presumption. NCAA Notice Of Allegations (Doc. #61-10) at 12. Specifically, the NCAA alleged that Beaty knew that Love was a former college quarterback coach and spent time with quarterbacks on the team and – notwithstanding that knowledge – did not demonstrate that he

monitored his staff within the football program. The NCAA also claimed that on at least one occasion, Beaty saw Love watching film alone with the Kansas quarterbacks. According to the NCAA, Beaty failed to identify red flags involving Love and to ask pointed questions to confirm compliance with NCAA rules.

Beaty denied the NCAA's allegations. Defendant, however, conducted an investigation which concluded otherwise. Cooper Flower, an assistant video coordinator who apparently worked for Love, told defendant's outside counsel that "it was well known that [Love] coached and helped the quarterbacks."[4] Flower Interview (Doc. #81-4) filed January 31, 2020. Similarly, Carter Stanley, a KU quarterback, reported that Love "assisted" the offensive coordinator with "quarterback coaching." Stanley Interview (Doc. #81-5). Specifically, during the winter of 2017, the quarterbacks started having "position-based meetings" at which Love taught them about the defensive structure and schemes of other teams. Id. According to Stanley, these instructional meetings occurred twice a week for roughly six weeks. Another quarterback, Miles Fallin, confirmed that between 2017 and 2018, Love "just basically taught us like defense stuff," and that the quarterbacks would meet with Love "as like kinda quarterback group to watch film on opponents." Fallin Interview (Doc. #81-6). Like Stanley, Fallin confirmed that these meetings occurred "maybe a couple times a week" through the winter of 2018. Id. Moreover, Fallin

---

[4]     Plaintiffs assert that on summary judgment, the Court cannot consider the transcripts of defendant's interviews with these various individuals because the transcripts constitute inadmissible hearsay. See Rule 802, Fed. R. Evid. At the summary judgment stage, evidence need not be submitted "in a form that would be admissible at trial." Argo v. Blue Cross & Blue Shield of Kansas, Inc., 452 F.3d 1193, 1199 (10th Cir. 2006) (citations omitted). Parties may instead submit evidence that would be inadmissible at trial as hearsay on the theory that the evidence may ultimately be presented at trial in an admissible form. Id. Here, even if the transcripts constitute hearsay, i.e. what the interviewees said, defendant could submit this evidence at trial, for example, in the form of live testimony from the interviewees. Accordingly, the Court can consider the transcripts on summary judgment.

indicated that "Beaty would be in some of those meetings and kinda show validation for coach Love running it and kinda reminding us to, do things that he would say." Id. According to Fallin, "when Beaty was there, I would say it was more like a partnership, they were doing it together." Id. Two other quarterbacks, Miles Kendrick and Peyton Bender, similarly recounted these quarterback meetings with Love, and likewise asserted that Beaty was present for some of them.

On November 21, 2019, Long sent Beaty a written notice that defendant was "converting [his] termination without cause to a termination with cause," consistent with Section 13(C) of the Beaty Agreement. Long Notice (Doc. #61-11). According to Long, defendant had completed its investigation into "significant violations of NCAA rules and regulations" by Beaty, and found that those allegations were true. Id. Specifically, defendant found that Beaty knew that Love "engaged in countable coaching actions" and that Beaty failed to promptly report such violations. Id. Long stated that "[t]his termination with cause has been contemplated since December 2018 following information reported to [defendant] officials concerning conduct and behavior of your subordinates and reported information that you may have had knowledge of possible rules violations." Id. Long noted that on December 13, 2018, White had informed Beaty of this "contemplated action," and "[n]ow that both the NCAA rules investigation and [defendant's] investigation are complete, and following an evaluation of the findings, such termination with cause is appropriate." Id. Long concluded by informing Beaty that pursuant to Exhibit A to the Beaty Agreement, he had "five calendar days from receipt of this notice to deliver a written request for an appeal of this contemplated action to the Officer of the Chancellor. If no written request is timely received . . ., the termination with cause shall become final." Id.

Beaty did not appeal the decision. To date, defendant has not made any "without-cause" payments to Beaty or DB Sports.

### III.    Lawsuit And Plaintiffs' Motion For Summary Judgment

On March 12, 2019, Beaty and DB Sports sued defendant, asserting claims for breach of contract (Count 1) and violations of the Kansas Wage Payment Act, K.S.A. § 44-313 (Count 2). Complaint (Doc. #1).  On August 8, 2019, in response to defendant's motion to dismiss, the Court held a hearing at which it determined that the Court had subject matter jurisdiction based on diversity of citizenship.  See Motion Hearing (Doc. #30).

On December 20, 2019, before the parties had engaged in significant discovery, including conducting any depositions, plaintiffs filed a motion for summary judgment on part of their breach of contract claims.  Plaintiffs' Partial Motion For Summary Judgment On Their Breach Of Contract Claim (Doc. #60).  Defendant responds that (1) the Court lacks subject matter jurisdiction, (2) the Court should deny summary judgment because in violation of Rule 56(a), Fed. R. Civ. P., plaintiffs failed to identify the issues on which they seek summary judgment, (3) the record creates genuine issues of material fact on plaintiff's breach of contract claims and (4) pursuant to Rule 56(d), Fed. R. Civ. P., the Court should deny summary judgment because the parties have not yet completed essential discovery.

### Legal Standards

### I.    Subject Matter Jurisdiction And Reconsideration

A federal court may exercise jurisdiction only when specifically authorized to do so, see Castaneda v. INS, 23 F.3d 1576, 1580 (10th Cir. 1994), and must dismiss the action "at any time that it lacks subject-matter jurisdiction." Fed. R. Civ. P. 12(h)(3).  Because federal courts have limited jurisdiction, the law imposes a presumption against jurisdiction.  Marcus v. Kan. Dep't of Revenue, 170 F.3d 1305, 1309 (10th Cir. 1999).  Therefore, plaintiffs bear the burden of showing that jurisdiction is proper and must demonstrate that the Court should not dismiss the

case.  Id.  Conclusory allegations of jurisdiction are not enough.  Jensen v. Johnson Cty. Youth Baseball League, 838 F. Supp. 1437, 1439-40 (D. Kan. 1993).

When a party asks the Court to reconsider a prior decision which denied dismissal based on subject matter jurisdiction, the Court reviews the party's motion under Rule 54(b), Fed. R. Civ. P.  Ziegler v. Dale, No. 18-71-SWS, 2019 WL 1882679, at *1 (D. Wyo. Jan. 18, 2019) (authority to reconsider interlocutory order such as prior order denying dismissal, exists solely under Rule 54(b));  SFF-TIR, LLC v. Stephenson, 264 F. Supp. 3d 1148, 1218-19 (N.D. Okla. 2017) (differentiating reconsideration of final orders and reconsideration of interlocutory orders);  In re Winkle, No. 13-11743 T7, 2016 WL 920393, at *1 (Bankr. D.N.M. Mar. 10, 2016) (unpublished) (Rule 54(b) provides mechanism for reconsidering interlocutory orders).  To reconsider interlocutory orders such as this under Rule 54(b), the Tenth Circuit consults the standard under Rule 59(e), Fed. R. Civ. P.  Ziegler, 2019 WL 1882679, at *1; Volt Asset Holdings Tr. XVI v. Martinez, No. 13-508 KG/KK, 2015 WL 11089507, at *1 (D.N.M. Aug. 21, 2015) (citing Ankeney v. Zavaras, 524 Fed. Appx. 454, 458 (10th Cir. 2013)).  Under Rule 59(e), the movant carries the burden of demonstrating that the Court should alter or amend a judgment.  Ziegler, 2019 WL 1882679, at *1.  To do so, the movant must show (1) a change in law, (2) new evidence and/or (3) clear error or manifest injustice.  Crawford v. United States Marshals Serv., No. 18-2003-KHV, 2018 WL 2220850, at *2 (D. Kan. May 15, 2018).  Whether to grant a motion for reconsideration is committed to the Court's sound discretion.  Id.

## II.    Summary Judgment

Pursuant to Rule 56(a), Fed. R. Civ. P., parties may move for summary judgment by "identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving parties are entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Liberty Lobby, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of the party's position. Id. at 252.

The moving parties bear the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving parties meets their burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which it carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  To carry its burden, the nonmoving party may not rest on its pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party.  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51.  In response to a motion for summary judgment, parties cannot rely on ignorance of facts, speculation or suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988); Olympic Club v. Those Interested Underwriters at Lloyd's London, 991 F.2d 497, 503 (9th

Cir. 1993).  The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at 251-52.

## Analysis

### I.     Subject Matter Jurisdiction

On August 8, 2019, the Court held that pursuant to 28 U.S.C. § 1332, it had subject matter jurisdiction based on diversity of citizenship.  Motion Hearing (Doc. #30).  Specifically, the Court found that the parties were completely diverse because when plaintiffs filed their complaint, defendant was a citizen Kansas, while Beaty and DB Sports were citizens of Texas.  Defendant asserts that in so holding, the Court fumbled the ball.

As explained above, for the Court to reconsider its prior holding that it has subject matter jurisdiction, defendant must show (1) a change in law, (2) new evidence and/or (3) clear error or manifest injustice.  Crawford, 2018 WL 2220850, at *2.  Here, defendant asserts clear error.  Specifically, defendant reiterates the argument that the Court previously rejected: even if defendant is a citizen of Kansas,[5] Beaty and DB Sports are also citizens of Kansas, which destroys complete diversity.  Given the importance of subject matter jurisdiction and because defendant apparently

---

[5]     Defendant mentions another argument that the Court previously rejected: because it is an "arm of the state," defendant is not a citizen of Kansas for purposes of diversity jurisdiction and is immune from suit under the Eleventh Amendment of the United States Constitution.  Beyond briefly reiterating the Court's prior holding and asserting that it "respectfully disagrees," defendant does not further address this issue.  Defendant's Memorandum In Opposition To Plaintiffs' "Partial Motion For Summary Judgment On Their Breach Of Contract Claim" (Doc. #82) filed January 31, 2020 at 55 ("Putting aside, for the time being, the arm-of-the-state and Eleventh Amendment issues, there still remains no complete diversity.").  Defendant instead focuses on the issue of Beaty's citizenship by challenging what it wrongfully believes was the basis for the Court's finding that Beaty and DB Sports were citizens of Texas.  The Court therefore does not revisit defendant's "arm of the state" assertion.

misinterprets the bases for the Court's prior holding,[6] the Court again addresses this issue. See Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009) (subject matter jurisdiction defines Court's authority to hear case); Ziegler, 2019 WL 1882679, at *1 (on motion to reconsider, readdressing defendants' arguments regarding subject matter jurisdiction).

Plaintiffs assert that the Court has subject matter jurisdiction based on diversity of citizenship. To invoke diversity jurisdiction under 28 U.S.C. § 1332, plaintiffs must show that when they filed their complaint, they had complete diversity of citizenship from defendant, which means that neither of them were citizens of the same state as defendant. Grice v. CVR Energy, Inc., 921 F.3d 966, 968 (10th Cir. 2019); Hakan Agro DMCC v. Unova Holdings, LLC, 640 F. App'x 821, 824 (10th Cir. 2016) (diversity measured when complaint filed).

Defendant argues that when plaintiffs filed their complaint, the parties were not completely diverse because even if defendant was a citizen of Kansas (and not an arm of the state), Beaty and DB Sports were also citizens of Kansas. For purposes of diversity jurisdiction, a person is a citizen of the state in which he is domiciled, which means the state in which he physically resides with the intent to remain indefinitely. Martinez v. Wurtz, No. 08-3008-SAC, 2008 WL 341469, at *2 (D. Kan. Feb. 6, 2008). To determine whether a person intends to indefinitely remain in a state,

---

[6]       In arguing that the Court erred in finding subject matter jurisdiction, defendant cherry-picks questions from the hearing transcript to suggest that the bases for the Court's holding were that (1) complete diversity might exist sometime in the future (that is, if Beaty did not establish diversity of citizenship as of the time when he filed suit, "he may have it next week, or he may have it the week after that. So, at some point, I assume there would be a situation where you could concede that diversity does exist.") and (2) the Court should exercise jurisdiction for the sake of convenience because if it dismissed the case, Beaty would likely re-file in state court (Court asks what is the "end game" for defendant's motion to dismiss). Defendant's Memorandum In Opposition To Plaintiffs' "Partial Motion For Summary Judgment On Their Breach Of Contract Claim" (Doc. #82) at 60. Nowhere did the Court suggest, let alone hold, that these *questions* were the bases for its holding. The Court instead found that it has subject matter jurisdiction because defendant, Beaty and DB Sports were completely diverse when plaintiffs filed the lawsuit.

the Court looks to objective factors such as places of employment, driver's license, automobile registration, bank accounts, tax payments, location of personal property and voting practices. Creeden v. Torres, No. 13-1176-JPO, 2013 WL 6119071, at *2 (D. Kan. Nov. 21, 2013).

Here, when he filed suit, Beaty was a citizen of Texas for purposes of diversity jurisdiction. Before coming to Kansas, Beaty spent most of his life and coaching career at various football programs throughout Texas. When defendant terminated Beaty's employment, Beaty immediately returned to Texas, where he had better job prospects. To minimize displacement, Beaty's wife and youngest daughter stayed in their house in Kansas while Beaty moved to Texas to find a job, where his other daughter attended school. Beaty briefly resided in Rowlett, Texas before signing a lease on an apartment in Austin, Texas. He registered to vote in Texas, obtained a Texas driver's license, registered his car in Texas and updated his car insurance to reflect that he lived in Texas. On March 12, 2019, the date when plaintiffs filed their complaint, DB Sports filed an annual report with the State of Kansas which listed Beaty's mailing address as his house in Lawrence, Kansas. At this time, however, Beaty was still living in Austin and had been in employment discussions with various football programs in Texas. In combination, these factors show that Beaty resided in Texas and intended to remain there indefinitely. Accordingly, for purposes of diversity jurisdiction, Beaty has shown that when he filed this lawsuit, he was a citizen of Texas. Because defendant is a citizen of Kansas, the parties are completely diverse, and the Court has subject matter jurisdiction.[7]

---

[7]     Defendant also asserts that as a limited liability company, DB Sports is also a citizen of Kansas because its only member is Beaty, who defendant argues is a citizen of Kansas. See Mgmt. Nominees, Inc. v. Alderney Investments, LLC, 813 F.3d 1321, 1325 (10th Cir. 2016) (limited liability company takes citizenship of its members). The Court has already found that Beaty is a citizen of Texas, which collapses defendant's argument.

## II.    Summary Judgment

Plaintiffs assert that defendant breached the Beaty and DB Sports Agreements when it terminated Beaty's employment and refused to make certain payments or to follow certain procedures.  Specifically, plaintiffs first claim that because defendant terminated Beaty without cause, defendant breached the Beaty and DB Sports Agreements by refusing to make the required payments.  In other words, plaintiffs assert that once defendant terminated Beaty without cause, the agreements prohibited defendant from retroactively terminating Beaty for cause.  Alternatively, plaintiffs claim that even if their agreements permitted retroactive termination for cause, defendant did not follow the required procedures for such a termination.

To succeed on a claim for breach of contract under Kansas law,[8] each plaintiff must show that (1) a contract existed, (2) sufficient consideration supported the contract, (3) plaintiff performed or was willing to perform in compliance with the contract, (4) defendant breached the contract and (5) plaintiff suffered damages as a result of defendant's breach.  No Spill, Inc. v. Scepter Canada, Inc., No. 18-2681-JAR, 2019 WL 6840076, at *5 (D. Kan. Dec. 16, 2019).

Here, plaintiffs seek summary judgment on the third prong (plaintiffs' performance or willingness to perform) and one of their claims under the fourth prong (defendant's breach).  Specifically, plaintiffs assert that they are entitled to judgment as a matter of law on their claims that (1) defendant breached the Beaty and DB Sports Agreements when it terminated Beaty

---

[8]    Kansas courts apply the rule of *lex loci contractus* to breach of contract claims.  Mirville v. Allstate Indem. Co., 71 F. Supp. 2d 1103, 1107 (D. Kan. 1999).  Under this rule, the law of the state where the parties made the contract controls.  Id.  Here, the parties agree that Kansas law governs plaintiffs' breach of contract claims.

without cause, retroactively terminated him for cause and refused to make the required payments and (2) Beaty performed his obligations under the Beaty Agreement.[9]

## A.     Defendant's Breach

As the Court explained above, plaintiffs' first theory of breach is that when defendant terminated Beaty without cause, the agreements required certain payments and prohibited defendant from retroactively terminating Beaty's employment for cause. Under Kansas law, the cardinal rule of contract interpretation is that the Court must ascertain and give effect to the parties' intent. McGlon v. Sprint Corp., No. 16-2099-JAR, 2018 WL 1847035, at *5 (D. Kan.

---

[9]     In their opening memorandum, plaintiffs pose the following narrow issue: "The only question this motion presents is one of law: Whether [defendant] can retroactively and unilaterally re-terminate the contracts (this time supposedly with cause) under the unambiguous terms of the parties' contracts." Memorandum In Support of Plaintiffs' Partial Motion For Summary Judgment On Their Breach Of Contract Claim (Doc. #61) at 12. Despite this limited question, plaintiffs then argue that as a matter of law, Beaty performed his obligations under the Beaty Agreement. Id. at 16. Accordingly, plaintiffs properly moved for summary judgment on these two issues.

In their reply to defendant's response, however, plaintiffs apparently seek summary judgment on an alternative theory of defendant's breach. Specifically, plaintiffs assert, "With the benefit of [defendant's] response, Plaintiffs will reframe the pure question of law before the Court: Whether [defendant] finds any support for its actions under the unambiguous terms of the parties' contracts." Reply In Support Of Plaintiffs' Partial Motion For Summary Judgment On Their Breach Of Contract Claim (Doc. #99) filed February 21, 2020 at 13. Apparently explaining what "its actions" means, plaintiffs assert that defendant "did not following the 'Procedures for Termination or Suspension for Cause,' which is a clear breach of the contracts." Id. For the first time, plaintiffs then argue that defendant did not follow the procedures required for a for-cause termination.

Despite describing it as "reframing" the issue, plaintiffs attempt to seek summary judgment on an issue that they did not present in their opening memorandum. Accordingly, the Court does not address this issue. Fed. R. Civ. P. 56(a) (parties moving for summary judgment must "identify[] each claim or defense – or the part of each claim or defense – on which summary judgment is sought"); see Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 762 F.3d 1114, 1118 (10th Cir. 2014) (in absence of notice to nonmoving party, cases ordinarily disfavor award of summary judgment based on ground omitted from moving party's summary judgment motion); Green v. New Mexico, 420 F.3d 1189, 1196-97 (10th Cir. 2005) (nonmoving party should be given opportunity to respond to new material raised for first time in movant's reply); Minshall, v. McGraw Hill Broad. Co., 323 F.3d 1273, 1288 (10th Cir. 2003) (argument raised for first time in reply brief is waived).

Apr. 18, 2018).  Where a contract is unambiguous, the Court must determine the parties' intent from the four corners of the document, "without regard to extrinsic or parole evidence." Id. (citations omitted).  That is, the Court must enforce the contract as written. Id. Where a contract is ambiguous, however, "the intention of the parties is not ascertained by resort to the literal interpretation, but by considering all language employed, the circumstances existing when the agreement was made, the object sought to be attained, and other circumstances" which aid in determining the intention of the parties. Reed v. Phillip Roy Fin. Servs., LLC, No. 05-2153-JAR, 2007 WL 4233617, at *3 (D. Kan. Nov. 27, 2007) (citations omitted).  Accordingly, if terms or provisions within an agreement are ambiguous, "parol evidence is permitted to explain their meaning." Id. (citations omitted).

Whether a contract is ambiguous is a question of law for the Court, which considers whether the contract "contain[s] provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." McGlon, 2018 WL 1847035, at *5.  Once the Court determines that a contract is ambiguous, interpretation becomes a question of fact. Reed, 2007 WL 4233617, at *3; see Claytor v. Computer Assocs. Int'l, Inc., 262 F. Supp. 2d 1188, 1203 (D. Kan. 2003) (parties' intent in ambiguous contract is question of fact for jury to decide).

Here, plaintiffs assert that as a matter of law, the agreements unambiguously provided that once defendant terminated Beaty without cause, it could not retroactively terminate him for cause. In support, plaintiffs first argue that the agreements do not contain any provisions which allow a retroactive change of position.  Specifically, plaintiffs argue that the agreements only contemplate "two, mutually exclusive ways" that defendant could terminate Beaty's employment before his term expired: without cause or for cause.  Alternatively,  plaintiffs assert that permitting defendant

to retroactively change the status of Beaty's termination would render meaningless key components of the agreements. Specifically, pursuant to the agreements, if defendant terminated Beaty for cause, Beaty was entitled to certain procedures, such as an appeal and the right to receive the "without cause" payments during the pendency of his appeal. Plaintiffs argue that by first terminating Beaty without cause and subsequently changing the termination to one for cause, defendant effectively side-stepped these procedures, thus rendering them toothless. Accordingly, plaintiffs argue that this cannot be the correct interpretation of the agreements.

As a matter of law, the agreements are ambiguous on the issue whether defendant can retroactively terminate Beaty's employment for cause after initially terminating his employment without cause. First and foremost, the agreements actually contain language which suggests that defendant is expressly permitted to do so. In its opening paragraph about termination for cause, the Beaty Agreement expressly provided that defendant "may, for cause, terminate [Beaty's] employment at any time upon written notice to [Beaty]."[10] Beaty Agreement (Doc. #61-1) at 12. This provision does not say that defendant may terminate Beaty's employment for cause "only if there has not been a prior termination without cause" or "only if the agreement has not previously been terminated." It broadly says that defendant may do so "at any time," and for purposes of plaintiffs' motion for summary judgment, the Court declines to add limiting language that is not there.

Even if the agreements did not expressly allow defendant to retroactively terminate Beaty's employment for cause, they certainly do not expressly prohibit it. That is, contrary to plaintiffs'

---

[10] The DB Sports Agreement provides that the Beaty Agreement defines whether Beaty's termination was for cause. Accordingly, if Beaty's termination was for cause for purposes of the Beaty Agreement, it was also for cause for purposes of the DB Sports Agreement.

assertion, the agreements do not establish "two, mutually exclusive ways" that defendant could terminate Beaty's employment, or any variation of that language. Plaintiffs argue that this strict dichotomy flows from the fact that the agreements do not expressly allow retroactive termination for cause. In other words, because they do not expressly allow it, they must prohibit it. Of course, defendant can easily make the opposite argument: if the agreements do not prohibit defendant from retroactively terminating Beaty for cause, then they allow it. To this extent, plaintiffs are attempting to read into the contracts a right that is not there – the right to permanently freeze the original status of Beaty's termination, no matter what violations the parties discover down the road. Accordingly, plaintiffs are asking the Court to do exactly what they condemn with respect to defendant: rewrite the agreements to reflect their preferred outcome even though the agreements are silent on the issue. The Court declines to do so – for either defendant or plaintiffs.[11]

Because the agreements are ambiguous on the issue whether defendant can retroactively terminate Beaty's employment for cause, the Court can consider parole evidence to determine the parties' intent, which is a question of fact. Reed, 2007 WL 4233617, at *3. Here, beyond the agreements themselves, the record is devoid of any evidence regarding the parties' intent. Accordingly, the record creates genuine issues of material fact on plaintiffs' claims that defendant breached their agreements by terminating Beaty's without cause and refusing to make the required payments.[12] The Court therefore overrules plaintiffs' motion on this issue.

---

[11] Plaintiffs' alternative argument is that allowing defendant to retroactively terminate Beaty's employment for cause would effectively abolish the procedures required for such a termination. Plaintiffs have not explained, however, why previously designating Beaty's termination as one without cause would relieve defendant of its obligation to provide the required procedures once it treats the termination as one for cause.

[12] Even if the Court found that the agreements unambiguously permitted defendant to retroactively terminate Beaty's employment for cause, the record still creates a genuine issue of

(continued…)

## B.      Plaintiffs' Performance

Plaintiffs assert that as a matter of law, for purposes of his breach of contract claim, Beaty performed his obligations under the Beaty Agreement.[13]  Defendant contends that under the Beaty Agreement, Beaty had an obligation to undertake reasonable efforts to comply with NCAA rules and to promptly report any known violations.  Because Beaty failed to do so, defendant argues that he did not perform his obligations under the agreement.

As the Court explained above, the cardinal rule of contract interpretation under Kansas law is that the Court must give effect to the parties' intent.  McGlon, 2018 WL 1847035, at *5.  Where a contract is unambiguous, the Court must determine the parties' intent from the four corners of the document, "without regard to extrinsic or parole evidence."  Id. (citations omitted).  That is, the Court must enforce the contract as written.  Id.  Where a contract is ambiguous, however, "the intention of the parties is not ascertained by resort to the literal interpretation, but by considering all language employed, the circumstances existing when the agreement was made, the object sought to be attained, and other circumstances' which aid in determining the intention of the parties."  Reed, 2007 WL 4233617 (citations omitted).  Accordingly, if terms or provisions within

---

[12](… continued)
material fact whether cause existed for his termination.  Specifically, the Beaty Agreement's definition of "cause" contains qualifying language which precludes summary judgment on this issue.  Beaty Agreement (Doc. #61-1) at 12-13 (cause includes failure "in any material respect" to perform duties to undertake "reasonable best efforts" to comply with NCAA rules or to promptly report to the Director if he knows and/or "has reasonable cause to believe" that violations occurred); Id. at 6 (cause includes "significant, or repetitive or intentional violations" of NCAA rules and failing to promptly report if he "knew or should have known of" such violations).

[13]      While asserting that Beaty performed his obligations under the Beaty Agreement, plaintiffs do not mention DB Sports or any of its obligations under the DB Sports Agreement.  Plaintiffs instead focus exclusively on whether Beaty had an obligation under the Beaty Agreement to not commit NCAA violations and/or report known violations.  Accordingly, the Court assumes that plaintiffs do not seek summary judgment on the issue whether DB Sports performed its contractual obligations.

an agreement are ambiguous, "parol evidence is permitted to explain their meaning." Id. (citations omitted).

Whether a contract is ambiguous is a question of law for the Court, which considers whether the contract "contain[s] provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." McGlon, 2018 WL 1847035, at *5. Once the Court determines that a contract is ambiguous, interpretation becomes a question of fact. Reed, 2007 WL 4233617, at *3; see Claytor, 262 F. Supp. 2d at 1203 (parties' intent in ambiguous contract is question of fact for jury to decide).

Here, plaintiffs argue that the Beaty Agreement unambiguously limits Beaty's obligations to work as the head football coach or, as the agreement explains it, "serv[ing] as head football coach for the term of this Agreement and [] devot[ing] his full time and attention and giv[ing] his best efforts and skill exclusively to the duties required of him as the KU head football coach." Beaty Agreement (Doc. #61-1) at 1. According to plaintiffs, Beaty satisfactorily performed these duties. Therefore, plaintiffs reason that Beaty performed his agreement regardless whether he took reasonable efforts to comply with NCAA rules and promptly reported known violations. Defendant responds by reciting the long list of provisions in the Beaty Agreement that expressly require Beaty to do exactly that. Defendant points out that the Beaty Agreement labels many of these provisions as his "duties and responsibilities," and that they explicitly constitute grounds to terminate Beaty's employment for cause.

Plaintiffs' contention is clearly without merit. Beaty's "duties and responsibilities" under the Beaty Agreement unambiguously included the "undertaking of his reasonable best efforts to comply with and assure that all persons under his supervision, including coaches and student-athletes, compl[ied] with the rules and regulations" of the NCAA. Beaty Agreement (Doc. #61-

1) at 1-2.  Moreover, the agreement explicitly required Beaty to "promptly" report to the Director if he became aware, "or [had] reasonable cause to believe," that violations concerning NCAA rules may have occurred.  Id. at 2.  But wait.  There was more.  The agreement reiterated this obligation, providing that Beaty "agree[d] that he shall report promptly to the Director any violations known to Head Coach of governing athletics rules, including NCAA and/or Big 12 rules, or [defendant] or KU rules, regulations or policies by any person under Head Coach's direct control or supervision, including but not limited to assistant coaches and student-athletes."  Id. at 6.  Accordingly, the Beaty Agreement unambiguously extended his contractual obligations beyond just coaching.[14]

Plaintiffs do not argue that as a matter of law, Beaty took reasonable efforts to comply with NCAA rules and report known violations.  Instead, they argue that he had no contractual duty to

---

[14]  Beaty's duty to "comply and report" is crystal clear, and plaintiffs' only argument to the contrary is that defendant's interpretation renders toothless the procedural rights to which Beaty was entitled in the event of a for-cause termination.  Specifically, plaintiffs argue that if Beaty had duties to "comply and report," and if he failed to do so, he would be in breach of contractual obligations, which would immediately relieve defendant of its contractual obligations, including providing Beaty the procedures required for a termination for cause.

This argument runs contrary to blackletter contract law.  Under Kansas law, when a party fails to perform a particular contract obligation, that failure does not automatically relieve the other party from performing its contractual obligations.  Firestone v. Hawker Beechcraft Int'l Serv. Co., No. 10-1404-JWL, 2012 WL 683286, at *12 (D. Kan. Mar. 2, 2012) (discharge of obligations under contract does not arise from every prior breach).  Rather, the breach "must be material and the failure to perform so substantial as to defeat the object of the parties in making the agreement.  A breach which goes to only a part of the consideration, which is incidental and subordinate to the main purpose of a contract, does not warrant rescission."  Id. (quoting In re Johnsons Estate, 202 Kan. 684, 691–92 (Kan. 1969)).  More importantly, even if a breach is material, the parties can contract for what happens in the event of such a breach, including requiring certain procedures.  Wenzel Mach. Co. v. Gen. Elec. Co., No. 98-2341-GTV, 1999 WL 1179643, at *2 (D. Kan. Nov. 23, 1999) (under Kansas law, parties are free to make their own contracts where not illegal, against public policy or induced by fraud); Totonelly v. Galichia Med. Grp., P.A., No. 09-1234-JTM, 2012 WL 628231, at *12 (D. Kan. Feb. 27, 2012) (if material breach, contract required nonbreaching party to provide notice and period to cure).  Here, the parties expressly agreed on certain substantive and procedural consequences that would ensue if Beaty failed to perform his obligations regarding NCAA rules.

comply and report.  The Court rejects that premise and must therefore overrule plaintiffs' motion for summary judgment on the issue of performance.

      **IT IS THEREFORE ORDERED** that <u>Plaintiffs' Partial Motion For Summary Judgment On Their Breach Of Contract Claim</u> (Doc. #60) filed December 20, 2019 is **OVERRULED.**

      Dated this 14th day of April, 2020 at Kansas City, Kansas.

                              <u>s/ Kathryn H. Vratil</u>
                              KATHRYN H. VRATIL
                              United States District Judge